

**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

MARIA AMAYA TORRES and MINERVA NOLASCO,
_____
                                        Plaintiffs,

                    vs.                                    Case Number    **2015 CA 007701 B**

DISTRICT OF COLUMBIA, c/o Attorney General of D.C.,
_____
441 4th Street, NW, Washington, D.C. 20001
_____
                                        Defendants.

### SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Steven P. Hollman, Esq.
_____
Name of Plaintiff's Attorney
Hogan Lovells US LLP
_____
555 Thirteenth Street, N.W.
_____
Address
Washington, D.C. 20004-1109
_____

(202) 637-5600
_____
Telephone

*Clerk of the Court*

By _____
                              Deputy Clerk

Date _____ **10/07/2015** _____

如需翻譯,請打電話 (202) 879-4828   Veuillez appeler au (202) 879-4828 pour une traduction   Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시요    የትርጉም እርዳታ ካስፈለገዎት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH
### INFORMATION SHEET

MARIA AMAYA TORRES, ET AL

vs

DISTRICT OF COLUMBIA, ET AL

Case Number: **2015 CA 007701 B**

Date: _____

[X] One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* Steven P. Hollman, Esq. | Relationship to Lawsuit |
| Firm Name: Hogan Lovells US LLP | [x] Attorney for Plaintiff |
| Telephone No.: (202) 637-5600    Six digit Unified Bar No.: 375658 | [ ] Self (Pro Se)   [ ] Other: _____ |

TYPE OF CASE: [X] Non-Jury          [ ] 6 Person Jury          [ ] 12 Person Jury

Demand: $_____          Other: __Injunction_____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____ Judge: _____ Calendar #:_____

Case No.:_____ Judge: _____ Calendar#:_____

---

### NATURE OF SUIT:     *(Check One Box Only)*

#### A. CONTRACTS                    COLLECTION CASES

[ ] 01 Breach of Contract
[ ] 02 Breach of Warranty
[ ] 06 Negotiable Instrument
[ ] 07 Personal Property
[ ] 13 Employment Discrimination
[ ] 15 Special Education Fees

[ ] 14 Under $25,000 Pltf. Grants Consent
[ ] 17 OVER $25,000 Pltf. Grants Consent
[ ] 27 Insurance/Subrogation
     Over $25,000 Pltf. Grants Consent
[ ] 07 Insurance/Subrogation
     Under $25,000 Pltf. Grants Consent
[ ] 28 Motion to Confirm Arbitration
     Award (Collection Cases Only)

[ ] 16 Under $25,000 Consent Denied
[ ] 18 OVER $25,000 Consent Denied
[ ] 26 Insurance/Subrogation
     Over $25,000 Consent Denied
[ ] 34 Insurance/Subrogation
     Under $25,000 Consent Denied

#### B. PROPERTY TORTS

[ ] 01 Automobile
[ ] 02 Conversion
[ ] 07 Shoplifting, D.C. Code § 27-102 (a)

[ ] 03 Destruction of Private Property
[ ] 04 Property Damage

[ ] 05 Trespass

#### C. PERSONAL TORTS

[ ] 01 Abuse of Process
[ ] 02 Alienation of Affection
[ ] 03 Assault and Battery
[ ] 04 Automobile- Personal Injury
[ ] 05 Deceit (Misrepresentation)
[ ] 06 False Accusation
[ ] 07 False Arrest
[ ] 08 Fraud

[ ] 10 Invasion of Privacy
[ ] 11 Libel and Slander
[ ] 12 Malicious Interference
[ ] 13 Malicious Prosecution
[ ] 14 Malpractice Legal
[ ] 15 Malpractice Medical (Including Wrongful Death)
[ ] 16 Negligence- (Not Automobile, Not Malpractice)

[ ] 17 Personal Injury- (Not Automobile, Not Malpractice)
[ ] 18 Wrongful Death (Not Malpractice)
[ ] 19 Wrongful Eviction
[ ] 20 Friendly Suit
[ ] 21 Asbestos
[ ] 22 Toxic/Mass Torts
[ ] 23 Tobacco
[ ] 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☒ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

_____
Date



### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

MARIA AMAYA TORRES et al
Vs.                                            C.A. No.      2015 CA 007701 B
DISTRICT OF COLUMBIA et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge BRIAN F HOLEMAN
Date: October 7, 2015
Initial Conference: 9:30 am, Friday, January 08, 2016
Location: Courtroom 214
          500 Indiana Avenue N.W.

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

Filed
D.C. Superior Court
10/07/2015 13:□□PM
Clerk of the Court

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

MARIA AMAYA TORRES
5182 Eastern Ave., N.E., Apt. #204
Washington, D.C. 20011

and

MINERVA NOLASCO,
1515 Ogden St., N.W.
Washington, D.C. 20010

on behalf of themselves and all others similarly
situated,

         *Plaintiffs,*

         v.

DISTRICT OF COLUMBIA
John A. Wilson Building
1350 Pennsylvania Ave., N.W., Suite 419
Washington, D.C. 20004

and

LAURA ZEILINGER, Director of the District of
Columbia Department of Human Services, in her
official capacity,
64 New York Ave., N.E., 6th Floor,
Washington, D.C. 20002

         *Defendants.*

Case No.  2015 CA 007701 B

Judge  _____

## CLASS ACTION COMPLAINT

This civil rights action challenges the multiple, serious failures of the District of Columbia Department of Human Services to provide language access services to the residents of the city. Plaintiffs Maria Amaya Torres and Minerva Nolasco (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, seek to remedy violations of their rights secured by Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d et seq.

("Title VI"), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 et seq. ("DCHRA"), by Defendants the District of Columbia ("the "District") and Laura Zeilinger, Esq., the Director of the District of Columbia Department of Human Services (collectively, "Defendants"). Defendants have violated the rights of Plaintiffs and discriminated against them by denying them language access services mandated by law. For their complaint against Defendants, Plaintiffs therefore state and allege the following:

## NATURE OF THE ACTION

1.      The District's Department of Human Services ("DHS") is failing in its mission to serve those most in need, because it fails to communicate effectively with them.

2.      Through DHS, the District has taken on the responsibility of providing sustenance, medical care, and other temporary benefits and services to the District's low-income residents. Many of the District's diverse residents, who have emigrated from around the world, speak little-to-no English; that is, they are non-English proficient ("NEP") or limited-English proficient ("LEP"). To serve this at-risk population adequately, the District has an obligation— born from local law, federal law, and basic morals—to utilize interpreters to facilitate conversations between these residents and the DHS agents who serve them, and to translate the documents that DHS provides to these LEP/NEP residents. Conversations between DHS agents and a resident, and documents issued by DHS to that resident, often concern matters of critical importance for the resident—namely, the basis for decisions as to that resident's entitlement to benefits. DHS agents have thus been instructed, by the agency's director, to communicate with LEP/NEP residents through multilingual staff and/or a telephonic translation service known as the "Language Line."

3.      DHS agents routinely flout this instruction, and the law.  According to field tests conducted by the District's Office of Human Rights ("OHR"), which is the agency tasked with monitoring compliance with the District's Language Access Act of 2004 (the "LAA"), DHS fails to provide language access services as required by law in approximately half of the interactions DHS has with District residents.  For example, DHS will fail to translate critical documents into LEP/NEP residents' language and will refuse to provide interpretation services for LEP/NEP residents.  DHS agents do so despite being fully aware of their legal obligation to provide language access services to LEP/NEP District residents; the LEP/NEP status of all the residents that they serve; and, in most instances, explicit on-the-spot requests for interpretation and translation services.  DHS simply runs roughshod over all of this, intentionally discriminating against the individuals it serves, without compunction.  DHS's conduct has earned it the rock-bottom score of "0/5" for the "quality" of its language access services, according to a 2014 report issued by the OHR.

4.      Plaintiffs Maria Amaya Torres and Minerva Nolasco have experienced this discrimination first-hand.  In the case of Ms. Torres, she had her Supplemental Nutrition Assistance Plan benefits slashed by nearly two-thirds after the District refused her request to provide an interpreter at her annual re-certification appointment.  In the case of Ms. Nolasco, she was denied critical medical care when she was seven months pregnant because her health benefits were canceled erroneously and not reinstated due to a miscommunication caused by DHS's failure to provide an interpreter.  In both cases, DHS was well aware of the customer's NEP status but refused to provide translation and interpretation services nonetheless.

5.      DHS's failure to provide translation and interpretation services is more than just an inconvenience—it is illegal.  On this point, the law is unequivocal.  Under Section 3 of the

3

LAA, DHS "shall provide oral language services to a person with limited or no English proficiency who seeks to access or participate in the services, programs, or activities offered by" DHS. Under Section 4 of the LAA, DHS "shall provide translations of vital documents into any non-English language spoken by a limited or no-English proficient population that constitutes 3% or 500 individuals, whichever is less, of the population served or encountered, or likely to be served or encountered, by the covered entity in the District of Columbia."[1]  Applicable federal regulations also direct District agencies to "take reasonable steps, considering the scope of the program and the size and concentration of [an LEP/NEP] population, to provide information in appropriate languages to" such LEP/NEP persons.  *See* 28 C.F.R. 42.405(d)(1).

6.      DHS's actions are discriminatory.  That is, they violate the DCHRA and Title VI.  DHS's repeated failure to provide language services—in the face of explicit requests for translation and interpretation, local laws and federal regulations compelling such language services, and multiple determinations by the OHR that DHS is violating these laws—evidences an intent to discriminate against individuals on the basis of their national origin (*see* Claims I and II).  Further, DHS's failure to provide language services has a disparate discriminatory impact on people of Hispanic and other foreign origin, as such persons are denied benefits in disproportionate numbers (*see* Claim III).

7.      By this action, Plaintiffs, on behalf of themselves and all others who are similarly situated, seek to change DHS's unlawful discriminatory practice of denying necessary translation and interpretation services to LEP/NEP District residents.  Plaintiffs seek an order

---

[1] Both Ms. Nolasco and Ms. Torres speak Spanish, which is a language spoken by approximately 90 percent of the LEP/NEP residents who are customers of DHS.  DHS has acknowledged that Spanish-speakers make up more than 3% or 500 of the individuals they serve, encounter, or are likely to encounter.  Because this exceeds the threshold set by the LAA, DHS is required to provide written translations of vital documents in Spanish to Spanish-speaking District residents.

enjoining defendants, at a minimum, to comply with the requirements of the LAA; to enjoin DHS from retaliating against District residents who complain about DHS's failure to provide language services; and to take all necessary measures to ensure that 100 percent of the District's LEP/NEP residents who seek translation or interpretation services with the DHS are provided with such assistance.

## JURISDICTION

8.      This Court has jurisdiction over this matter pursuant to D.C. Code §11-921.

9.      This Court is the appropriate forum for this action, as all Plaintiffs and Defendants are domiciled in the District, most if not all relevant events took place in the District, and all relevant documents and witnesses are located in the District.

## FACTS

**A.  The Parties.**

10.     Plaintiff Maria Amaya Torres is a Spanish-speaking resident of the District. As described in greater detail below, Ms. Torres is a low-income resident who relies on the District's Supplemental Nutrition Assistance Program ("SNAP"), as administered by DHS, to provide food for her family. SNAP benefits are colloquially referred to as "food stamps."

11.     Plaintiff Minerva Nolasco is a Spanish-speaking resident of the District. As described in greater detail below, Ms. Nolasco is a low-income resident who relies on the DC Healthcare Alliance medical insurance program ("Alliance"), as administered by DHS, for necessary medical care and treatment. Ms. Nolasco also relies on SNAP to provide food for her family.

12.     Defendant District of Columbia is a municipal entity organized under Article I, Section 8, Clause 17 of the U.S. Constitution, and under the laws of the United States. Through DHS, the District implements and administers benefits programs for the District's low-income

5

and at-risk residents. These programs, which include nutrition and health care benefits, are designed to provide temporary support and assistance while the recipients maximize their potential for economic security and self-sufficiency.

13. Defendant Laura Zeilinger is the Director of DHS. In that capacity, Zeilinger oversees a broad range of policy and administrative issues for DHS. This includes DHS's provision of translation and interpretation services in compliance with the LAA, Title VI, the DCHRA, and all other laws, statutes, regulations, and policy directives concerning language access. Plaintiffs bring this action against Zeilinger in her official capacity as Director of DHS only.

## B. The Department of Human Services Has a Woeful Record of Failing to Provide Legally-Required Language Access Services to Its LEP/NEP Residents.

14. DHS serves a critical function in the District's communities, providing a variety of basic services for families and persons in need. For example, it provides medical benefits to low-income residents; it provides food and nutritional benefits; it provides housing and shelter for individuals or families who are homeless, at risk of being homeless, or otherwise in need of emergency shelter; and it provides a variety of other services for families and individuals, ranging from child care to family violence prevention.

15. To access DHS's services, District residents need to communicate with DHS agents. This is done both in-person at DHS service centers (such as the center located at 1207 Taylor Street, N.W., Washington, D.C. 20011), and via documentation that is provided by or to residents. Of the approximately 200,000 customers that DHS serves every year, approximately 22,000 are LEP/NEP customers. Of those 22,000 LEP/NEP customers, 90 percent (or almost 20,000) are Spanish speakers.

16.     The individuals who interact with DHS tend to be low-income and include a disproportionately high percentage of LEP/NEP persons, almost all of whom immigrated to the United States from elsewhere in the world.

17.     Where an LEP/NEP resident seeks to have a conversation with a DHS agent, the DHS agent is required by law to provide that individual with "oral language services." D.C. Code § 2-1932(a).  These include "placement of bilingual staff in public contact positions; the provision of experienced and trained staff interpreters; contracting with telephone interpreter programs; contracting with private interpreter services; and using interpreters made available through community service organizations that are publicly funded for that purpose." D.C. Code § 2-1931(6).  To this end, when bilingual staff is not available to provide in-language services, DHS agents have access to the "Language Line," a telephone interpretation system whereby a DHS employee can engage an interpreter, over the telephone, to facilitate a discussion with a LEP/NEP resident.  According to a 2014 memorandum issued by the then-interim director of DHS, agents are instructed and required to use the Language Line as is necessary.

18.     Nonetheless, DHS agents routinely refuse to offer necessary interpretation and translation services.  This has resulted in administrative actions, called Language Access Complaints, pursued before the OHR, which is tasked with enforcing compliance with the LAA by the District's agencies.  Here are a few examples of such administrative actions:

- A Spanish-speaking resident alleged that, on three separate visits to a DHS service center in October and November of 2012, she was asked to fill out documents in English.  When she sought assistance from DHS agents, the agents repeatedly told her that they did not understand her question and instructed her to speak English.

7

- In November 2012, a Spanish-speaking resident went to the Taylor Street DHS Center to re-certify for the SNAP program. Although the DHS agent used the Language Line, she did not complete the resident's application correctly. The resident was subsequently denied her benefits, via a letter that was written in English. The resident returned to the Center on February 6, 2013 to explain that she needed to add her newborn son to her benefits. She asked to speak with a Spanish-speaking DHS agent; she was told she could not speak with one. The DHS agent utilized the Language Line but then told the resident that she could not help her. The resident, very upset, began to cry; she found a Spanish-speaking DHS agent (notwithstanding the prior representations that no agent was available for her) and explained what happened. This Spanish-speaking DHS agent then checked the resident's application, only to discover that it had never been processed. The DHS agent had no explanation for why it was never processed.

- A Spanish-speaking resident alleged that, on August 5, 2013, she called DHS approximately eight times with questions regarding her SNAP benefits. Each time, she asked the DHS agent for assistance in Spanish. Of those eight times, she either immediately was hung up on or—in English—asked to hold, causing her to wait for 10-15 minutes until her call ultimately was dropped. When she made similar calls to DHS on September 3, 2013, she again either was hung up on, or asked to wait on the line, with the calls eventually dropped.

19.     Upon information and belief, this is just the tip of the iceberg; DHS has a track record of failing to provide required translation and interpretation services.  In its 2014 Annual Compliance Review regarding language access in the District (the "OHR Report"), the OHR observed that, just in fiscal year 2014, DHS had three (3) complaints docketed for administrative proceedings—tied for the most among all District agencies.  (OHR Report at 6.)  In all three cases, the OHR found DHS to be non-compliant with the LAA.  (*Id.*)  That is more non-compliance findings than any other agency and half of all non-compliance findings in fiscal year 2014.  A true and correct copy of the OHR Report is annexed hereto as **Exhibit A**.

20.     In preparing the OHR Report, the OHR also performed an investigation into DHS's practices by conducting 19 in-person tests and 14 telephone field tests (for a total of 33 tests).  (*Id.* at 42.)  The OHR found that DHS "met only half or less compliance requirements" of the LAA.  (*Id.* at 21.)  Specifically, DHS—despite having a "comprehensive system in place for identifying and tracking LEP/NEP customers"—regularly failed to provide language access services to its customers.  (*Id.* at 42.)  The OHR Report remarks that "almost half of the tests [15 out of 33] were met with inadequate quality of service."  (*Id.*)  This performance earned DHS a score of 0/5 for quality of service, the lowest of any District agency.  (*See generally id.*)

21.     The fact that DHS has a "comprehensive system in place for identifying and tracking LEP/NEP customers" yet regularly fails to provide language access services demonstrates that DHS's discrimination is intentional.  DHS can and does carefully track which residents need translation or interpretation services, but it nonetheless refuses to provide these services to these residents.

22.     DHS's leadership is well aware of the agency's failure to provide adequate language access services, yet it has failed to improve the agency's practices.  In November 2014,

the then-interim director of DHS, Deborah A. Carroll, sent a memorandum to "All DHS Staff" observing that, between May 2013 through October 2014, DHS had received approximately eight complaints from the OHR relating to non-compliance with the LAA.  Calling this a "trend," Carroll directed the DHS Staff to improve its performance, reminding the DHS Staff of the Language Line Services and other measures they can take to ensure that all residents are provided with translation and/or interpretation services whenever they request them.

23.     Unfortunately, as the experiences of Ms. Torres and Ms. Nolasco demonstrate (*see infra*), DHS has not improved its access to translation and interpretation services under the leadership of its current director, Laura Zeilinger.  Thus, DHS continues to discriminate against District residents on the basis of their national origin.

### C. Ms. Torres Had Her SNAP Benefits Wrongly Reduced as a Result of DHS's Failure to Provide Necessary and Required Translation and Interpretation Services.

24.     Ms. Torres is a Spanish speaker.  She does not speak English.  Ms. Torres carries an "I Speak" card created by the OHR indicating that she speaks Spanish and requires Spanish language services.  Ms. Torres shows this card to government employees to inform them that she speaks Spanish and thus needs interpretation and translation.

25.     Ms. Torres is enrolled in the SNAP program.  She relies on SNAP to feed her family.  Without SNAP benefits, Ms. Torres' ability to feed her child and herself would be in constant jeopardy.

26.     To remain eligible for SNAP benefits, Ms. Torres must appear, in person, once a year at DHS to re-certify her personal and financial information.  At these appearances, Ms. Torres must bring various documents regarding her household income and rent.  Ms. Torres is then interviewed by a DHS agent, who reviews these documents and asks Ms. Torres a series of questions concerning her income and costs.

27.     DHS knows that Ms. Torres is a Spanish speaker who requires Spanish interpretation and written translation.

28.     On October 8, 2014, Ms. Torres brought her required proofs for re-certification to the DHS Taylor Street Service Center, arriving in the afternoon.  She was directed to Room 204, where she waited to be called by the next available eligibility agent.

29.     When Ms. Torres was called by the DHS agent, she asked the agent for a Spanish interpreter.  The DHS employee said, in substance and in English, "nobody here in Spanish."  Ms. Torres then pulled out her "I Speak" card and gave it to the DHS employee.  The DHS employee still refused to provide interpretation.  The DHS agent refused even to provide access to the Language Line.

30.     Without communicating with Ms. Torres, the DHS agent simply received Ms. Torres' proofs and typed some information into her computer, and then Ms. Torres left the Center.

31.     After her October 8, 2014 trip to the DHS Center, Ms. Torres received a notice in the mail that her SNAP plan had been re-certified—but for only $87 each month.  Ms. Torres immediately recognized that this amount was below the amount to which she was entitled.

32.     It would later come to light that DHS had not input Ms. Torres' information correctly into its system.  In fact, the information that Ms. Torres provided to the DHS agent on October 8, 2014 had not been input into the system at all.  Instead, DHS—having refused to communicate with Ms. Torres in Spanish—made a determination regarding Ms. Torres' entitlement to benefits based on outdated information about Ms. Torres' partner's income and her previous receipt of unemployment benefits.  It was not until after intervention by an attorney

acting on Ms. Torres' behalf in November, 2014 that DHS began issuing Ms. Torres the correct SNAP benefits of $220 per month.

33.     Due to DHS's failure to provide language access services, Ms. Torres went one month without receiving the sufficient SNAP benefits to feed her family.

34.     Sadly, this was not Ms. Torres' first experience with DHS's failure to provide language access services. Earlier, when she went to the DHS Taylor Street Service Center in October 2013 to re-certify for benefits, she asked for—but was refused—language access services. Similarly, when she returned to the service center in April 2014 to report that her partner had moved to the District and to apply for Medicaid for him (and to renew Medicaid for herself), the DHS agent again refused to provide her with language access services. Ms. Torres was forced to enlist the assistance of a bilingual 16-year-old stranger who was there with her mother—but still, the DHS agent refused to help Ms. Torres. These and similar interactions that Ms. Torres had with DHS were the subject of a June 2014 complaint that Ms. Torres filed with the OHR. After hearing the evidence, the OHR found Ms. Torres' complaints to be substantiated and ruled that DHS was in non-compliance with the LAA.

35.     Further, Ms. Torres has witnessed other individuals not being provided with necessary interpretation services. When she was waiting to be called by a DHS agent on October 8, 2014, Ms. Torres could overhear the interviews of other persons that were also taking place. The person who was called just before Ms. Torres was also a Spanish speaker. She was asking the eligibility worker for Spanish interpretation, but the worker was saying "no, there's nobody," or words to that effect. The DHS agent resorted to using the woman's approximately six-year-old daughter to communicate with the resident.

**D. As a Result of DHS's Failure to Provide Necessary and Required Translation and Interpretation Services, Ms. Nolasco Lost Her Medical Insurance When She Was Seven Months Pregnant.**

36.     Ms. Nolasco is a Spanish speaker.  She does not speak English.  DHS knows that Ms. Nolasco is a Spanish speaker who requires Spanish interpretation and written translation.

37.     Ms. Nolasco, a mother of three, receives Alliance medical insurance through a benefits program administered by DHS.  This program is of critical importance to Ms. Nolasco, who, at the times relevant herein, was pregnant with her third child.  With her baby due in late September 2015, Ms. Nolasco's August 2015 prenatal doctor's appointments needed to be conducted at the George Washington University Hospital (as opposed to her local clinic) (the "GWU Hospital").  Her first appointment at the GWU Hospital was scheduled for August 5, 2015.

38.     Approximately three weeks before that appointment, on July 13, 2015, Ms. Nolasco went to the DHS Taylor Street Service Center to re-certify for SNAP benefits (for her family) and Alliance benefits (for herself and her partner).  She was accompanied by her partner, who speaks limited English.  When she left the Service Center, she believed that her benefits would continue, and that nothing had changed—although, as a Spanish speaker, she did not communicate with any of the staff at DHS.

39.     Then, unexpectedly, on August 2, 2015, the GWU Hospital called to cancel her upcoming appointment.  The GWU Hospital said that Ms. Nolasco did not have medical insurance, and that the hospital could not see her until her medical insurance was active again.  This event caused Ms. Nolasco to be concerned that her Alliance benefits had been canceled.

40.     Three days later, Ms. Nolasco returned to the DHS Taylor Street Service Center to ask why she no longer had medical insurance.  This time, Ms. Nolasco's partner could not join

her; Ms. Nolasco needed to speak with someone in Spanish. However, when Ms. Nolasco asked for someone who spoke Spanish, DHS employees told her that no one was available.

41.     Ms. Nolasco did what she could to communicate with DHS agents. However, the interactions were frustrating, at best. Ms. Nolasco tried to explain that she was there to follow up on a re-certification for medical insurance that she had already completed. DHS agents, however, tried to provide Ms. Nolasco with a new application for benefits. Ms. Nolasco's repeated attempts to tell DHS staff that she did not need a new application for benefits were unavailing. At the end of Ms. Nolasco's visit, a female DHS employee arrived to speak Spanish with Ms. Nolasco—but only briefly. The employee told Ms. Nolasco to just wait 10 days for the issue to resolve itself.

42.     On August 14, 2015, Ms. Nolasco received a notice stating that her benefits had, in fact, not been renewed and had been canceled, on the ground that her "current income exceeds policy standards" (which was not true). The part of the notice that stated that her benefits were canceled was in Spanish—but the explanation of why her benefits had been canceled, as quoted above, was in English. This notice is clear evidence that DHS knew that Ms. Nolasco spoke Spanish—that is why they issued part of the notice in Spanish—but nonetheless wrote the substantive reason for her denial of benefits, in the same sentence, in English. A true and correct copy of this notice is annexed hereto as **Exhibit B**. Ms. Nolasco had to resort to using her phone to translate the key words of the notice into Spanish, which gave her a limited understanding of what the notice said.

43.     On August 17, 2015, Ms. Nolasco visited DHS—for a third time—to inquire about the letter that she had received three days prior. Again, Ms. Nolasco was served by an English-speaking DHS employee. When Ms. Nolasco said "no hablo inglés" (I don't speak

14

English), the DHS employee did not provide interpretation. When a bilingual DHS employee happened to pass by, this bilingual worker stopped to tell Ms. Nolasco that there was nothing else she could do, her benefits were canceled, and she needed to re-apply. However, by that time it was 10:30 a.m., and the bilingual worker told Ms. Nolasco that it was too late for her to re-apply. Ms. Nolasco had to come back the next day, getting there early enough to be able to apply.

44.     On August 18, 2015, Ms. Nolasco appeared—for a fourth time—at the DHS Center. This time, she was attended to by two Spanish speakers. (One was a DHS agent who generally handles questions/concerns, and the second was the DHS agent who helped Ms. Nolasco specifically to re-apply.) The second agent put Ms. Nolasco's information into the system and said it would take 30-45 days for the re-application to go through. Ms. Nolasco did not receive a letter indicating that she had been re-enrolled in Alliance benefits until Friday, September 4, 2015.

45.     As a result of DHS's refusal to provide translation or interpretation services, Ms. Nolasco wrongly lost her Alliance medical insurance benefits at a critical time of need. In the month of August 2015—when she was seven to eight months pregnant—Ms. Nolasco did not receive any ultrasounds or other prenatal care, as the GWU Hospital would not see her without the insurance that DHS had wrongfully canceled. By the end of the month, Ms. Nolasco was less than a month away from her due date and experiencing pain and discomfort in her abdomen.

## CLASS ACTION ALLEGATIONS

46.     Plaintiffs bring this case as a class action under Superior Court Civil Rules 23(a) and 23(b)(2) on behalf of the following class: **All LEP/NEP residents of the District who,**

since January 1, 2012, have sought to benefit from the public services provided by DHS (the "Class").

47.    Defendants' discriminatory practice of failing to provide translation and/or interpretation services has harmed all members of the Class.  Plaintiffs estimate that members of the Class are so numerous that joinder of all members is impracticable.  Indeed, according to DHS's own documents, in 2013, there were over 22,000 LEP/NEP residents of the District who had sought to benefit from DHS's services.

48.    Defendants' relationship with the members of the Class, and Defendants' failure to provide language access services with respect to members of the Class, has been substantially uniform.  Questions of law and fact will predominately be common to the Class.

49.    Defendants have acted in a manner generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

50.    There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members.  Common questions include, but are not limited to:

- Whether Defendants' failure to provide translation and interpretation services violates Title VI;

- Whether Defendants' failure to provide translation and interpretation services violates the DCHRA;

- Whether Defendants' failure to provide translation and interpretation services has a disparate impact on persons based on their national origin;

- Whether Defendants' failure to provide translation and interpretation services deters or excludes residents who are otherwise eligible for assistance from seeking such assistance from DHS;

- Whether Defendants have deterred, retaliated, or threatened to retaliate against persons who have complained about DHS's failure to provide language access services; and

- What equitable and injunctive relief for the Class is warranted.

51.     Plaintiffs' claims are typical of the claims of the Class: (1) each of the Plaintiffs has been denied language access services; (2) each has suffered harm as a result of the denial of language access services; and (3) each has the same discrimination claim based on disparate impact.  All of these claims are shared by each and every Class member.

52.     Plaintiffs fairly and adequately represent and will protect the interest of the members of the Class.  Plaintiffs have no conflict with one another or Class members.  Plaintiffs are committed to the goal of having DHS stop discriminating against persons based on their national origin and improving its language access practices so as to eliminate its discriminatory impact based on national origin.

53.     Plaintiffs have retained counsel competent and experienced in class action discrimination litigation.

54.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute.  Defendants have acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policy and practice.

55.     DHS, an agency of the federally-created and supported District, *see* 1 Stat. 130, receives federal funds.

56.     As a proximate result of Defendants' discriminatory actions, Plaintiffs and the Class have suffered losses in benefits, earnings, and/or resources.  As a result of those actions and consequent harm, Plaintiffs and the Class have suffered such damages in an amount to be proved at trial.

57.     There is a real and actual controversy between Plaintiffs and Defendants regarding whether Defendants' practice of denying LEP/NEP residents translation or interpretation services is an ongoing violation of the DCHRA, D.C. Code § 2-1401.01 et seq., and of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.

58.     As a result, Plaintiffs are entitled to a declaratory judgment that the practices complained of herein are unlawful.

### FIRST CLAIM
### (Intentional Discrimination
### Under the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq.)

59.     Plaintiffs re-allege and incorporate herein by reference the allegations in all preceding paragraphs.

60.     Plaintiffs bring this claim on their own behalf and on behalf of the Class.

61.     Defendants' practice of denying interpretation and translation services to LEP/NEP district residents—despite (i) legal compulsion under the LAA and other laws and regulations to do so; (ii) Defendants' awareness of its' customers' LEP/NEP status; and (iii) explicit, on-the-spot requests by LEP/NEP residents for translation or interpretation services— has harmed, and continues to harm, Plaintiffs and the Class, and constitutes unlawful discrimination on the basis of national origin in violation of D.C. Code § 2-1401.01 et seq.

62.     Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  Plaintiffs and the Class are now suffering, and will continue to suffer, irreparable injury from Defendants' discriminatory acts and omissions.

63.     Defendants' conduct has caused, and continues to cause, Plaintiffs and the Class substantial losses in benefits, earnings, and/or resources.

## SECOND CLAIM
### (Intentional Discrimination
### Under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.)

64.     Plaintiffs re-allege and incorporate herein by reference the allegations in all preceding paragraphs.

65.     Plaintiffs bring this claim on their own behalves and on behalf of the Class.

66.     Defendants' practice of denying interpretation and translation services to LEP/NEP district residents—despite (i) legal compulsion under the LAA and other laws and regulations to do so; (ii) Defendants' awareness of its' customers' LEP/NEP status; and (iii) explicit, on-the-spot requests by LEP/NEP residents for translation or interpretation services— has harmed, and continues to harm, Plaintiffs and the Class, and constitutes unlawful discrimination on the basis of national origin in violation of 42 U.S.C. § 2000d et seq.

67.     Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  Plaintiffs and the Class are now suffering, and will continue to suffer, irreparable injury from Defendants' discriminatory acts and omissions.

68.     Defendants' conduct has caused, and continues to cause, Plaintiffs and the Class substantial losses in benefits, earnings, and/or resources.

## THIRD CLAIM
### (Disparate Impact Discrimination
### Under the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq.)

69.     Plaintiffs re-allege and incorporate herein by reference the allegations in all preceding paragraphs.

70.     Plaintiffs bring this claim on their own behalf and on behalf of the Class.

71.     Defendants' practice of denying translation or interpretation services to LEP/NEP residents has a disparate impact based on national origin and is neither job-related nor consistent with business necessity.  Even if Defendants' practice of denying translation or interpretation services to LEP/NEP residents could be justified as a business necessity, which it cannot, less discriminatory alternatives exist that would serve any legitimate purpose.

72.     Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  Plaintiffs and the Class are now suffering, and will continue to suffer, irreparable injury from Defendants' discriminatory acts and omissions.

73.     Defendants' conduct has caused, and continues to cause, Plaintiffs and the Class substantial losses in benefits, earnings, and/or resources.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court issue judgment in their favor granting the following relief:

74.     Certifying the case as a class action on behalf of the proposed Class;

75.     Designating Representative Plaintiffs Maria Amaya Torres and Minerva Nolasco as representatives of the Class;

76.     Designating Representative Plaintiffs' counsel as Class Counsel;

77.     Issuing a declaratory judgment that the practices complained of herein are unlawful and violate Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d et seq.; and the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq.

78.     Issuing a permanent injunction against Defendants, and all of their officers, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in the unlawful policies, practices, customs, and usages set forth herein;

79.     Issuing an order that Defendants, to eliminate the possibility of further acts of discrimination, institute and carry out policies, practices, and programs that ensure compliance with the D.C. Language Access Act of 2004;

80.     Issuing an order prohibiting Defendants from retaliating against District residents who complain about DHS's failure to provide translation or interpretation services;

81.     Awarding costs incurred, including reasonable attorneys' fees to the extent allowable by law; and

82.     Granting such other and further legal and equitable relief as this Court deems necessary, just, and/or proper.

Washington, D.C.                         Respectfully submitted,
October 7, 2015

                                         HOGAN LOVELLS US LLP

                                         By:  /s/ Steven P. Hollman
                                             Steven P. Hollman (D.C. Bar # 375658)
                                             Ryan J. Strasser (D.C. Bar # 1008955)

                                         555 Thirteenth Street, N.W.
                                         Washington, D.C. 20004-1109
                                         Tel.:      202-637-5600
                                         Email:     steven.hollman@hoganlovells.com
                                                    ryan.strasser@hoganlovells.com

WASHINGTON LAWYERS COMMITTEE
FOR CIVIL RIGHTS AND URBAN AFFAIRS

By:  /s/ Matthew Handley
    Matthew Handley (D.C. Bar # 489946)
    Elliot M. Mincberg (D.C. Bar # 941575)
    Dennis Corkery (D.C. Bar # 1016991)

11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel:     202-319-1000
Email:  matthew_handley@washlaw.org
        elliot_mincberg@washlaw.org
        dennis_corkery@washlaw.org

*Attorneys for Plaintiffs*

OF COUNSEL:

Nathaniel S. Boyer, Esq. (pro hac petition forthcoming)
HOGAN LOVELLS US LLP
85 Third Avenue
New York, N.Y. 10022

Lauren Cury, Esq. (pro hac petition forthcoming)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109

Allison Miles-Lee (D.C. Bar # 982879)
BREAD FOR THE CITY
1525 7th Street, N.W.
Washington, D.C. 20001

District of Columbia

# Office of Human Rights

## Language Access in the District:
## 2014 Annual Compliance Review



ohr.dc.gov

Office of Human Rights
DISTRICT OF COLUMBIA

2

# Contents

Note from Winta Teferi .......... 3
Introducing the Team .......... 4
About Language Access .......... 5
FY14 Highlights .......... 10
10 Years of Language Access .......... 12
LEP/NEP & Foreign-Born Residents .......... 14
Methodology, Findings & Recommendations .......... 16
FY14 Agency Compliance Scorecards .......... 26
Compliance Details .......... 62





# Winta Teferi, Director
# Language Access Program



This has been a truly incredible and dynamic year for Language Access in the District. The 10-year anniversary of the DC Language Access Act of 2004 was celebrated through spirited citywide events, regulations guiding the implementation of the Language Access Act were updated for the first time in six years, a walkthrough protocol for public official visits in linguistically diverse neighborhoods was adopted, and DC joined jurisdictions around the country in working towards greater access and inclusion for immigrant communities.

It is therefore with great excitement that I present to you the Office of Human Rights (OHR) "Language Access in the District: 2014 Annual Compliance Review" and invite you to read about our collective achievements as a city. This report includes individual compliance scorecards for 33 District agencies identified as major public contact entities, and policy recommendations combining input from limited and non-English proficient (LEP/NEP) communities, agency frontline staff, advocates, and consultative entities on strategic priorities for deepening language access in the years ahead.

The District continues to be a popular destination for a growing and increasingly diverse foreign-born population, and remains one of the most linguistically diverse cities in the nation. More than 15.6 percent of people in the District speak a language other than English at home, and 26,400 residents – five percent of the District population – over the age

of five speak limited or no English. Without language access, thousands of our residents would be excluded from accessing critical public services, and from contributing to the local economy. Language access is vital to our city, it not only promotes wellbeing and inclusion for all our residents, but more importantly, it is an economic strategy for attracting and retaining a global workforce and business community that is known to fuel local economic development and growth.

Tasked with stewarding this exciting citywide inclusion effort for the District, I am committed to building on DC's growing role as a national model for language access implementation, and the tangible infrastructural improvements achieved over the last 10 years. As we continue to celebrate these achievements, we must remain vigilant to close compliance gaps and prioritize the development of innovative and transformative approaches by providing linguistically and culturally accessible services. I look forward to continue working with agencies, Language Access Coordinators, community partners, and LEP/NEP communities to translate the Language Access Act from a set of legal requirements to day-to-day practices that can create an inclusive and effective service delivery culture throughout our government.

# Introducing the Team

Our team is comprised of the Language Access Program Director, Program Specialist, Language Access Fellows, as well as a rotating internship program attracting skilled multilingual students and young professionals who are passionate about advancing the work of the program.



### Winta Teferi | Director

With over 10 years of combined experience in organization development consulting, program management and multicultural community building, Winta has worked in both government and non-profit arenas on issues of access, inclusion and civic engagement. Before joining OHR, Winta worked as a Program Analyst for the Mayor's Office on African Affairs, and as Program Director of IMPACT Silver Spring. She holds a M.A. in Organization Development from American University and a B.A. in Economics from the University of Maryland. She is fluent in Amharic and French.



### Gretta Rivero | Program Specialist

Gretta is the primary technical assistance provider to District agencies and community partners, cultivating strong relationships and ensuring that all program stakeholders obtain up-to-date language access resources, information and support. Gretta brings strong project management and community outreach experience. A DC native, she earned her B.A. in Liberal Arts with an emphasis on visual arts at American University and studied French civilization and fine arts at the Sorbonne University of Paris. With roots in Venezuela, Gretta is fluent in Spanish and French.



### Elsa B. Teklehymonot | Fellow

Elsa has contributed immensely to advancing the program's compliance monitoring and quality assurance efforts during her year-long fellowship at OHR. Born and raised in Ethiopia, Elsa studied in Uganda and Ireland where she earned two M.A. degrees, one in gender studies and economics and another in development studies. Elsa brings over seven years of experience on issues of gender equality, access and economic empowerment. She is fluent in Amharic and Tigrigna.



### Silvia Torres-Simonetti | Fellow

An attorney with experience in Family Law in Venezuela, and a Spanish and French translator certified by the American Translators Association (ATA), Silvia brings her legal background and strong language skills to OHR's Language Access team. Silvia conducts outreach in the Latino community, educates LEP/NEP residents on their rights, assists with investigation of Language Access discrimination complaints, and reviews and translates agency's vital documents into Spanish and French.



### Ivory Chen | Research and Data Analysis Intern

Originally from China, Ivory brings strong research and analytical skills, as well as a passion for ensuring access for Asian immigrant communities. She recently earned an M.A. in sociolinguistics and linguistic anthropology from the University of Chicago, and holds a B.A. in translation and interpretation from the Beijing Foreign Studies University. She is fluent in Chinese and Taiwanese.

# About Language Access

The Language Access (LA) Program organizes its work into four areas. The program provides support and accountability for covered entities to ensure that they meet their obligations under the Language Access Act and guarantee equal access for all District residents.



**Enforcement**

Individuals who believe their rights have been violated under the law may file a language access complaint with OHR. Once docketed cases are investigated, the OHR Director in consultation with the LA Director issues written findings and works with agencies found in non-compliance to identify and monitor systemic corrective actions.



**Technical Assistance**

The program serves as a citywide point of contact for all covered entities on issues related to Language Access. The team responds to daily inquires from agencies who seek guidance and resources; routinely trains covered entities' staff on compliance requirements and cultural competency; and provides targeted support to major public contact entities by working with their Language Access Coordinators and teams via quarterly meetings and individualized consultations.

**Our primary focus is to ensure equity of service to individuals despite English language proficiency.**

**Community Engagement**

The LA Program works closely with the DC Language Access Coalition, the Mayor's ethnic constituency offices, and diverse immigrant-serving community-based partners to ensure LEP/NEP communities are aware of their rights under the law. The program goes out in the community delivering "Know Your Rights" trainings, giving LEP/NEP residents an opportunity to learn about their rights and share their experiences on accessing government services.



**Compliance Monitoring**

The program fulfills this function by ensuring each major public contact agency identifies an attainable two-year plan that guides individual agency accountability to the Act, and by reviewing the agency's progress on this plan on a quarterly basis. Thirty-three major public contact agencies currently have biannual plans. Agency Language Access Coordinators report to and meet with the program quarterly to monitor progress and quality of services delivered to LEP/NEP customers.



# Enforcement

OHR's Language Access Program is responsible for investigating complaints from the public about individual or systemic language access violations by covered entities in the District. The LA team's first step when receiving a complaint is to work with agencies to ensure that the LEP/NEP customer receives the immediate services they are qualified to receive, whether or not a formal complaint is docketed. For complaints docketed, the case is investigated over a 90 - 120 day period, followed by a final decision and monitoring of corrective actions that address non-compliance findings. In FY14, OHR received seven informal complaints and requests that were resolved outside the investigation process, and 17 complaints of which nine were docketed for full investigation. Out of the six non-compliance findings issued in FY14, three were against the Department of Human Services, two against Metropolitan Police Department and one against the Department of Motor Vehicles. One complaint against MPD is currently under investigation, and two complaints (DC Board of Elections & DC Taxicab Commission) were withdrawn by the complainant.

**Complaints Received in FY14**

17

Total Docketed Cases: 9
Total Dismissed Cases: 2

Reasons for Dismissals

Lack of jurisdiction (1), unable to contact complainant and insufficient information (2), and failure to state a claim (2).

**FY14 Complaints by Agency**

Dept. of Motor Vehicles: 3
Metropolitan Police Dept.: 3
Dept. of Human Services: 3
DC Taxicab Commission: 1
DC Housing Authority: 1
DC Board of Elections: 1
Agencies outside jurisdiction: 4
Unspecified: 1

**FY14 Docketed Cases by Agency**

Dept. of Human Services: 3
Metropolitan Police Dept.: 3
Dept. of Motor Vehicles: 1
DC Board of Elections: 1
DC Taxicab Commission: 1

**Outcome of Cases Docketed in FY14**

9



**Non-Compliance Findings by Agency**

Dept. of Human Services: 3
Metropolitan Police Dept.: 2
Dept. of Motor Vehicles: 1

**Reasons for Non-Compliance**

Agencies were found in non-compliance for failure to translate documents, provide interpretation, or both.

# Technical Assistance

OHR's Language Access Program provides technical assistance to 33 agencies with major public contact and all covered entities to ensure they serve and meet the needs of limited and non-English proficient customers. The LA program kicked off FY14 by identifying Language Access Coordinators' needs and priorities, and sustained support for agencies throughout the year by providing one-on-one consultations, training over 1441 agency staff on compliance requirements and cultural competency, and hosting six bimonthly meetings addressing specific compliance topics. Additionally, the program worked closely with Language Access Coordinators on special projects such as planning and implementing citywide events, developing FY15/16 Biennial Language Access Plans (BLAPs), and adopting a new digital planning and reporting tool.

"WE ARE TASKED WITH BRIDGING THE ACCESS GAP TO ENSURE BETTER PUBLIC SERVICES FOR INDIVIDUALS WHO ARE DECENT, CARING AND HARDWORKING, BUT MAY HAVE DIFFICULTIES COMMUNICATING IN THE ENGLISH LANGUAGE. AT LANGUAGE ACCESS COORDINATOR MEETINGS I FEEL INSPIRED AND WELL-PREPARED TO CARRY OUT THAT IMPORTANT TASK."

# 1441

DC government employees and contractors participated in OHR's 61 Language Access & Cultural Competency trainings in FY14.

## VOICES FROM THE FRONTLINES:
### EMPLOYEE FEEDBACK FROM LANGUAGE ACCESS & CULTURAL COMPETENCY TRAININGS

**TOP 3 CHALLENGES OF SERVING LEP/NEP CUSTOMERS:**
BUILDING TRUST
OVERCOMING CULTURAL DIFFERENCES
OVERCOMING STEREOTYPIC EXPECTATIONS OF LEP/NEP CUSTOMERS AND GOVERNMENT EMPLOYEES

**TOP 3 BENEFITS OF LIVING AND WORKING IN A MULTILINGUAL SOCIETY:**
EXPOSURE TO THE WORLD AND AN OPPORTUNITY TO LEARN FROM OTHER CULTURES
FOOD, ART, AND MUSIC
DIVERSE PERSPECTIVES AND CULTURAL ASSETS

**TOP 3 RECOMMENDATIONS FOR BETTER SUPPORTING FRONTLINE STAFF:**
OPPORTUNITY TO LEARN LANGUAGES
ONGOING TRAINING AND CULTURAL LEARNING OPPORTUNITIES
SUPPORT IN OUTREACH AND RELATIONSHIP BUILDING WITH DIVERSE LEP/NEP COMMUNITIES

# Community Engagement

The LA team works closely with the DC Language Access Coalition, the Mayor's ethnic constituency offices, and diverse immigrant-serving community-based partners to ensure stakeholders and LEP/NEP communities are aware of their rights. In FY14, OHR successfully reached over 1000 diverse LEP/NEP residents through its "Know Your Rights" trainings and door-to-door outreach leading up to the "DC Speaks Your Language" forum.

## FY14 COMMUNITY ENGAGEMENT

500 LEP/NEP residents received information on language access rights · 411 LEP/NEP residents participated in "Know Your Rights" trainings · 150 participated in "DC Speaks Your Language" forum · 71 community leaders and teachers trained to be volunteer language access ambassadors and liaisons

**26*** immigrant-serving outreach partners provided vital access to their diverse networks and constituents

**7**** key ethnic media outreach partners

**23** unique languages were identified within LA Program's network of bilingual volunteers

## 7945 "I SPEAK" CARDS DISSEMINATED

### in six different languages

* AmeriHealth DC · Ayuda · BRIYA Public Charter School · Carlos Rosano Public Charter School · Central American Resource Center (CARECEN) · Chinatown Service Center · Chinese Community Cultural Center · Community Preservation and Development Corporation · DC Schools Project · Equal Rights Center · Ethiopian Community Center · Ethiopian Community Services Center · Georgetown Human Rights Institute · HEP B Initiative of Washington, DC · HIPS · Korean American Grocers Association · Korean Cultural Center · Many Languages One Voice · Mekane Selam St. Urael Ethiopian Orthodox Tewahedo Church · Omega Gospel Mission Church · Oromo Community Organization · Our Lady Queen of the Americas Church · Shrine of the Sacred Heart Church · Terrific Inc. Asian & Pacific Islander Senior Center · The DC Hunger Project · The Social Tea House · Washington English Learning School

** El Zol Radio Station · La Mera · Washington Hispanic · Ethiopiawinet Radio · Addis Dimts Radio · New Tang Dynasty Television · The Korea Daily

# Compliance Monitoring

OHR's Language Access Program is tasked with ensuring that covered entities – all District government agencies, programs, contractors and vendors – meet their legal obligations under the Language Access Act. Section 2(3)(A) of the Act establishes specific planning and reporting requirements for covered entities with major public contact, which are defined as agencies whose primary responsibility consists of meeting, contracting, and dealing with the public. In FY14, the LA program provided targeted monitoring and guidance to 33 agencies with major public contact, working closely with Language Access Coordinators and Teams within these agencies to plan, implement and evaluate the provision of language support to LEP/NEP customers.

## Planning & Reporting Requirements for Major Public Contact Agencies:

### Biennial Language Access Plans (BLAP):

Each major public contact agency is required to develop a two-year plan containing detailed and tangible action steps unique to the agency that will be pursued over a two year period to meet data collection, translation, interpretation, training, and outreach requirements of the Act.

### Quarterly Reporting:

Each major public contact agency is required to submit quarterly progress reports to OHR containing data on LEP/NEP constituents encountered and language services provided to serve them. These reports also provide updates on translated vital documents, trainings and outreach activities conducted, and complaints received by the agency within each quarter.

### LEP/NEP Outreach:

Agencies are required to conduct outreach to LEP/NEP communities to disseminate information about the services and language assistance they offer.

## Compliance Requirements for Covered Entities:

- Collect data on language(s) spoken by the population served or encountered, or likely to be served or encountered, by the covered entity;

- Provide oral language services to LEP/NEP individuals who seek to access or participate in the services, programs, or activities offered by the covered entity;

- Provide and use translated vital documents when language encounters cross the three percent or 500 customer threshold; and

- Train agency staff on their legal obligations and resources available to them for serving LEP/NEP customers.

As required by the Act, the LA Program led a BLAP review process for all 33 major public contact entities on their FY15–FY16 plans. Draft plans identified compliance gaps and laid out specific action steps the agency will take over the course of the coming two years to fully meet the requirements of the Act. With input from Language Access consultative agencies and the DC Language Access Coalition, the LA program reviewed the drafts and provided detailed feedback for agencies to incorporate into their final plans. Once finalized and approved by the LA Director, agency BLAPs for FY15-16 will be published in the DC register.

At the end of each fiscal year, the Language Access Program conducts Language Access compliance assessments for each agency with major public contact as a key component of the program's annual report. Each agency with major public contact is provided with individual scorecards determining their performance scale for the fiscal year, including narratives on agency strength, weaknesses and the way forward. See page 18 for the compliance rating methodology for FY14, followed by individual scorecards for all 33 major public contact agencies.

# FY14 Highlights

*As part of the District's ongoing efforts to ensure equal access for all District residents, OHR worked with agencies and community partners on a number of citywide projects and strategic efforts to address persistent gaps and move the District closer to full compliance.*

## New Language Access Regulations

Newly amended regulations governing the DC Language Access Act of 2004 were finalized and formally published in September 2014. Updated for the first time in six years, these regulations offer detailed guidance on the implementation of the Act, and enhance the District's ability to meet the language needs of its LEP/NEP populations. The changes designate five new agencies as major public contact entities and task them with identifying an LA Coordinator, and with submitting periodic plans and reports for compliance under the law. Amendments to the regulations also specify new requirements for all covered entities such as assigning a Language Access Point of Contact for the agency, and reporting agency's encounters with LEP/NEP customers on an annual basis. Other key changes include modifications to the administrative process for tracking and investigating complaints received by OHR.

## Website Accessibility Project

Over 30 agencies now provide a description of their programs and services on their website in Amharic, Chinese, French, Korean, Spanish and Vietnamese. As of the official launch of this project in April 2014, a "Language Support" section had been added to District agency websites that links LEP/NEP users to agency services, and other in-language vital documents translated by the agency. The next phase of the Citywide Website Accessibility Project will include efforts to expand to other languages, and centralize all of the agency's existing translated vital documents to ensure they reach their intended audience and can be accessed with ease by both LEP/NEP customers and agency staff.



## District-wide Walkthrough Planning Protocol

The first ever citywide neighborhood walkthrough protocol was developed in October 2014 to provide planning tips and guidance for public official visits in linguistically diverse neighborhoods. The development of this protocol was the result of unique government-community collaboration in which senior staff from multiple District agencies including OHR, DOH, ABRA, DCRA, the Mayor's Community and Constituency Affairs Offices met with the DC Language Access Coalition. The goal of the protocol is to guarantee that language assistance is provided at all times - whether in emergency or planned circumstances - whenever public officials conduct walkthroughs in linguistically diverse neighborhoods.

## Quality Review Project



OHR initiated this project in 2014 as part of an ongoing effort to institute a comprehensive quality assurance mechanism for securing quality translation and interpretation services. The LA program convened a quality review panel of 12 qualified bilingual reviewers to assess the quality of Amharic, Chinese, French, Korean, Spanish and Vietnamese translations from over 14 agencies. Initial findings show more than 95 percent of the translations, on average, achieved a passing rating for their quality; with a relatively higher incidence of poor quality reported for African (Amharic) and Asian (Chinese, Korean, Vietnamese) translations. Quality concerns such as word-by-word translation, the usage of wrong terms and incorrect meanings continue to exist. The LA team will use findings from this review to work with OCP vendors, LA coordinators, and consultative partners to address these concerns and refine citywide quality assurance strategies.



## Electronic Monitoring

In an effort to streamline planning and reporting requirements associated with the implementation of the Language Access Act for major public contact agencies and all covered entities, the Language Access Program has embarked on a technology project to digitize LA compliance monitoring. OHR is currently developing a new tool for reporting and tracking which, once launched, will allow agencies to enter their Biennial Language Access Plans (BLAP), quarterly reports, encounters with LEP/NEP populations, and language services electronically. This application is designed to create an efficient system for agencies, stakeholders, and OHR to track each agency's progress, and access comprehensive data on encounters with LEP/NEP customers.

# 10 Years of Language Access

Ten years ago, the District pledged its support to the fast-growing immigrant community by unanimously passing the DC Language Access Act, which aims to ensure all residents have equal access to government services regardless of English language proficiency.



*LEP/NEP residents offer their recommendations for improving Language Access in roundtable discussions conducted simultaneously in nine different languages*

In celebration of the Language Access Act's ten year anniversary, OHR's Language Access Program partnered with agencies and stakeholders to host citywide events throughout FY14. OHR commissioned an Urban Institute report and held a panel to analyze demographic trends and successes and challenges in implementing the Language Access Act. "DC Speaks Your Language," a multilingual community dialogue and resource fair, was held in June where over 150 diverse limited and non-English proficient residents made recommendations for strengthening Language Access in the District. In addition to these celebrations, the District became a 'Welcoming City' in 2014 and joined a network of cities across the U.S. that share practices and policies for creating welcoming environments for immigrants that maximize opportunities for economic growth.

*"It was simply a dream — the way everything was planned out from the signage to the meals to the seating — and the opportunity for true community input and engagement across linguistic lines."*

*–Sapna Pandya, Executive Director, Many Languages One Voice*

### 10 Years of Access Report

OHR commissioned the Urban Institute for its "10 Years of Language Access in Washington, DC" report, which reflects on ten years of implementation and makes recommendations on how to further improve government services for those who are limited and non-English proficient. The report also analyzed demographic and linguistic trends regarding immigrants in DC. The report is available online at ohr. dc.gov/10years/report.

### Report Recommendations

· Continuing to improve data collection and analysis

· Recognizing bilingual skills in agency recruitment and retention

· Improving the quality and accessibility of services

· Considering further investments in the program

· Examining enforcement possibilities

### District a "Welcoming City"

The District joined the Welcoming Cities Initiative, building on the city's growing reputation as an attractive gateway city. As a member, the District will learn from national best practices on inclusion and help inform other jurisdictions on how to strengthen their own language access work. "Washington, DC is a national leader in implementing a language access policy that helps all residents become fully participating community members," said David Lubell, Executive Director of Welcoming America.



"DC Speaks Your Language": Modeling Multilingual Community Engagement

During roundtable discussions facilitated in nine different languages, LEP/NEP community members shared their personal stories, identified the barriers they encounter as non-English speakers, and provided recommendations directly to over 20 District government agency directors and representatives who came to hear from them. Community members were also accompanied by interpreters and language ambassadors as they received dental check-ups, applied for economic benefits, and received information on education, housing, job training, English as a Second Language (ESL) classes and more. OHR thanks the multi-stakeholder planning team comprised of agency representatives and community-based organizations, as well as the 52 bilingual volunteers who provided their linguistic skills at this event. OHR will use feedback from the forum to inform citywide priorities and advise agencies on best practices for strengthening linguistically and culturally competent service delivery.

## By the Numbers:
LEP/NEP & Foreign-Born
Residents in the District*

**1/3** of **DC population growth** attributed to the foreign-born population since 2007

**14.4%** of District residents are foreign-born (2013)

Foreign-born **population doubled** since 1970s

## District foreign-born places of birth by region:

| 44% | 19% | 18% | 16% | 2% | 1% |
|---|---|---|---|---|---|
| Latin America | Asia | Europe | Africa | Northern America | Oceania |

# 92,819

residents in the District are foreign-born

### eighty-five percent
of LEP/NEP individuals in DC are foreign-born

# 1 in 20
District residents over age five are LEP/NEP

**Spanish** is the most commonly spoken language among LEP/NEP people in the District



The four most common languages spoken among LEP/NEP people in the District are:

1. Spanish (60.8%)
2. Amharic (9.8%)
3. French (4.9%)
4. Chinese (3.1%)
5. Other (21.4%)

*Statistics are based on the 2012 American Community Survey (ACS) data provided by the DC Office of Planning's Data Center, and drawn from the Urban Institute's recent report on Language Access Implementation in the District.

**2/3** of LEP/NEP households are linguistically isolated** 

### 40 percent
of LEP/NEP residents in DC are US citizens



# 26,400

people in the District over the age of five are LEP/NEP

**10%**
of young children (ages 3 - 4) in the District live with LEP/NEP parents



**25%**
of LEP/NEP population in the District originally came from El Salvador

**51%**
of LEP/NEP people in DC are female



**49%**
of LEP/NEP people in DC are male

LEP/NEP people live in **all eight wards** but are concentrated in wards one and four

## eighty-four percent
of LEP/NEP population in DC are working age adults (18-64)

## Percent English proficient by language used at home:

| 61% | 83% | 51% | 85% | 64% | 68% |
|---|---|---|---|---|---|
| Spanish | French | Amharic/Ethiopian | German | Chinese | All Languages |

** The US Census Bureau defines a linguistically isolated household as one in which no one 14 years old and over is English proficient.





Methodology

Findings &

Recommendations

# Compliance Rating Methodology

The requirements mandated in the Language Access Act of 2004 and corresponding regulations fall into seven key areas for agencies with major public contact. All major public contact agencies are required to fulfill the following requirements to provide full access and participation in public services, programs, and activities for individuals in the District of Columbia with limited or no-English proficiency.

## About the Scorecards:

Language access compliance reviews were completed for 33 District government agencies in FY14. Each score is meant to measure an agency's overall compliance. A narrative is also provided to explain areas of improvement, gaps in compliance, and recommended priorities for FY15.

Agencies are provided with the number of compliance requirements met in FY14 based on their preparedness to assist LEP/NEP communities, agency accessibility and quality of service. Agencies where field tests were conducted are scored out of 14 requirements, while agencies without field tests are scored out of 12 requirements. The total agency score and total possible scores are available at the bottom of the compliance details report on page 62.

Field testing results are based on in-person or telephone-based interactions with the agency, where undisclosed testers speaking in a non-English language assess the quality of service. Testing is concentrated towards agencies with high frequency of contact, and therefore not all agencies received field tests in FY14.

## Compliance Requirements for Agencies:

(1) Data is collected on primary languages spoken;

(2) Interpretation services are provided;

(3) Vital documents are translated and used in the provision of services when language encounters cross the 3 percent or 500 customer threshold; and

(4) Personnel in public contact positions are trained on how to serve these customers.

Major public contact agencies must also:

(5) Complete a biennial language access plan;

(6) Designate a Language Access Coordinator; and

(7) Hold public meetings and conduct outreach to LEP/NEP communities.

Based on the method applied in FY13, the LA Program took the key requirements above, divided these into three categories (preparedness, accessibility and quality) and created 12 – 14 measures of performance by which agencies are assessed.

Preparedness measures actions taken and resources developed to prepare for interactions with LEP/NEP individuals, including but not limited to training, data collection and the performance of the Language Access Coordinator.

Accessibility captures the services or information an agency delivers or produces including, but not limited to, interpretation services, translation of vital documents and outreach.

Quality measures whether or not LEP/NEP customers received adequate language assistance or were turned away. This is evaluated based on complaints filed against the agency, field testing results and trends observed by OHR.

*Covered entities defined as "any District agency, department, or program that furnishes information or renders services, programs or activities directly to the public or contracts with other entities, either directly or indirectly, to conduct programs, services or activities. The term "covered entity" shall not include Advisory Neighborhood Commissions.*

OHR measures agency compliance in terms of preparedness, accessibility and quality of services by assigning a one point weight to each of the measurement statements below identified by an "x" and counted if affirmative. Data sources used to assess whether or not the agency met the compliance requirements included: FY13-14 BLAPs; FY14 Quarterly Reports; BLAP review notes; communication with LA Program (bimonthly meeting with Language Access Coordinator; report submission and requests for information); progress review on the status of FY13 LA program recommendations; input from community advocates; informal complaints captured from the public during community outreach; inquires about possible violations; docketed complaints; and determinations issued by OHR.

## PREPAREDNESS

| | |
|---|---|
| (1) | The agency provided data on FY14 encounters. |
| (2) | The method for collecting data was comprehensive and reliable. |
| (3) | The agency trained staff. |
| (4) | The agency communicated effectively with the LA Program throughout FY14. |

## ACCESSIBILITY

| | |
|---|---|
| (5) | The agency managed and is meeting requests for interpretation and/or translation services. |
| (6) | Vital documents were translated and/or updated in FY14. |
| (7) | The languages that vital documents were translated into in FY14 reflect the needs of LEP/NEP populations served at the agency. |
| (8) | Significant outreach efforts to LEP/NEP communities were conducted in FY14. |
| (9) | Translated vital documents are accessible on the agency website. |

## QUALITY

| | |
|---|---|
| (10) | OHR did not observe recurring problems or a trend in the nature of formal and/or informal complaints filed against the agency. |
| (11) | There were no instances in which the agency was found in non-compliance in FY14 (i.e. via formal complaints or audits). |
| (12) | There were no instances in which testers were turned away during field tests (i.e. agency employee hung up on the tester or told them they are unable to assist them.) NOTE: MEASURE OMITTED FOR AGENCIES THAT DID NOT RECEIVE FIELD TESTS |
| (13) | There were no instances in which testers accessed employee or interpretation but did not receive the requested information or services. NOTE: MEASURE OMITTED FOR AGENCIES THAT DID NOT RECEIVE FIELD TESTS |
| (14) | OHR has observed significant improvement, rather than a decline, in Language Access implementation in FY 14. |

# Summary of Findings

The LA Program assessed 33 District agencies on FY14 efforts to implement and fulfill the requirements of the Language Access Act.

## ACCESSIBILITY

Almost all major public contact agencies translated at least one vital document and a total of **1638 documents** were collectively translated by agencies in FY14.

## QUALITY

More than **67 percent** of field tests conducted in-person at **eight agencies** with extensive LEP/NEP contact provided the requested service or adequate language assistance.

## PREPAREDNESS

**23 agencies** reported more than one method for tracking LEP/NEP customers. However, agencies tend to rely heavily on Language Line usage reports as their primary source of data; with the exception of few agencies, such as DOC, DHS, and OUC who track encounters electronically through their customer management system.

## QUALITY

**Nine complaints** were filed against agencies alleging a violation of the Language Access Act of 2004 in FY14: 6 were found in non-compliance, 2 were withdrawn by complainant, and 1 is under investigation.

## QUALITY

Only **40 percent** of field tests conducted over the phone at agencies with extensive LEP/NEP contact provided the requested service or adequate language assistance.

## PREPAREDNESS

**18 agencies** reported providing OHR-led training to public contact and/or senior staff on Language Access compliance requirements and cultural competency. A few agencies reported providing either in-house and/or online training, while others reported plans to provide training in FY15.

## ACCESSIBILITY

**30 agencies** reported participating in at least one community outreach activity. Some agencies hosted targeted outreach events in LEP/NEP communities or implemented topic-specific campaigns to raise awareness of a particular service or project in an LEP/NEP community.

## Overall Compliance

# 6

agencies – CFSA, DCPL, DCHR, OPC, OUC, and OZ – received perfect compliance scores for successful implementation of the Language Access Act in FY14.

# 8

agencies – DPR, DPW, DDOE, DDOT, HSEMA, OA, DBH, and DOC – met most compliance requirements, except for one or two compliance areas that still require attention from the agencies

# 15

agencies – ABRA, DCHA, DCPS, DCRA, DDS, DOES, DOH, DHCD, DMV, DSLBD, MPD, OCP, OP, OSSE, and OTA – complied with more than half of the requirements, but failed to satisfy two or more requirements.

# 4

agencies – DCLB, DHS, FEMS, and OTR – met only half or less compliance requirements and will require substantial efforts in FY15 to effectively meet the needs of LEP/NEP customers.



## Progress Update on FY13 Recommendations

Below are brief updates on recommendations presented in OHR's FY13 report for citywide improvement in language access compliance.

### FY13 Recommendation: Continue Prioritizing Translation & Website Accessibility

FY14 Update: Twenty-seven of the 33 agencies translated at least one document and contributed towards the 1638 total vital documents collectively translated by agencies in FY14. While this is an encouraging achievement, persistent challenges remain in: a) ensuring translation efforts reflect the needs of agency's service population, b) addressing access gaps to basic forms and notices, c) getting translated documents to the intended audiences or agency staff, and d) improving website accessibility to LEP/NEP users.

### FY13 Recommendation: Increase Citywide Recruitment & Hiring of Bilingual Staff

FY14 Update: Major public contact agencies reported a total of 750 bilingual and/or multilingual staff in FY14 who speak Spanish (569), Amharic (54), French (41), Chinese (20), Vietnamese (15) and over 40 other different languages. A handful of agencies – such as MPD, CFSA, DHS and DPR – made visible efforts to attract bilingual staff by leaning on Mayor's ethnic constituency offices and community partners for access to diverse networks. These same agencies took steps to advertise positions explicitly expressing preference for bilingual skills. The LA Program will continue providing technical assistance to agencies who have requested guidance particularly in attracting bilingual staff who speak emerging Asian and African languages.

### FY13 Recommendation: Institutionalize Team-based Model for Shared Accountability

FY14 Update: Over 30 agencies have successfully identified and put in place Language Access Teams per OHR recommendations. While LA teams at 18 agencies – including CFSA, DBH, DOC, OA and DPR – share responsibilities and reported meeting as a team at least once in FY14, full and ongoing engagement of team members remains a challenge for Language Access Coordinators who often have minimal support and leverage in stewarding language access compliance in their agencies.

# OHR Recommendations for FY15 - FY16

## 1. Towards a Culture of Quality & Culturally Competent Customer Service

District government has undergone remarkable transformation over the last decade in serving non-English speaking customers. As is clear from the 71,139 language line calls made by agencies in FY14, the use of real-time phone-based interpretation services is now embedded into every day practice for frontline employees. While this is a great step, agencies can do more to heighten cultural awareness of staff, influence how they view clients from culturally and linguistically diverse populations, and reinforce agency-wide commitment to providing equitable and quality services to LEP/NEP customers. OHR recommends the following strategies for improving service delivery culture in FY15:

- Expand training opportunities so front-line staff can connect with diverse communities outside of the service delivery context, and reflect openly on the challenges and benefits of serving a diverse population.

- Create welcoming physical spaces that send a hospitable message to everyone walking in to receive services, and displaying culturally and linguistically targeted signage to visually orient LEP/NEP customers on the process ahead and availability of language assistance.

- Hire bilingual staff in centers where LEP/NEP customers are commonly encountered, and leverage the cultural and linguistic skills of bilingual staff to train all employees.

## 2. Understanding Needs Through Quality Data Collection

Collecting comprehensive and reliable data on LEP/NEP encounters is the cornerstone of the Language Access Act. Without determining who they are serving or are likely to serve, agencies compromise their own flexibility to prioritize the appropriate language assistance needed to accommodate their service population. While some agencies are gradually putting solid systems in place to collect reliable data, many interactions between agencies and LEP/NEP individuals go unrecorded – particularly encounters with locally-funded service providers and grantees, language assistance provided by bilingual staff, and field encounters with LEP/NEP individuals and businesses. Based on these findings, OHR recommends the following strategies for addressing this compliance gap in FY15:

- Expand Language Access Coordinators' authority and resources to monitor data collection practices throughout the agency's public contact activities and departments, and to institute reasonable internal reporting requirements.

- Ensure the Language Access Coordinator role, and/or membership in the agency's Language Access Team, is assigned to individuals who are already involved in customer service-related activities and can influence agency's business process.

- Convening and training all grantees and contractors carrying out direct services on their legal obligation to a) document all contact with LEP/NEP customers; b) report this data to the covered entity on a quarterly basis, and c) certify in writing that these requirements will be satisfied.

## 3. Improving Accessibility

Translation of vital documents continues to be a significant challenge for most agencies. In the absence of reliable data on their LEP/NEP encounters, agencies primarily revert to translating vital documents into Spanish only, and when resources allow, additional languages that may not mirror the needs of their customers. OHR reminds agencies that combining data on LEP/NEP encounters with an assessment of emerging LEP/NEP communities will be required to properly identify languages encountered or likely to be encountered by the agency. OHR recommends the following action steps for using resources more strategically as agencies work to improve access to written translations for LEP/NEP customers:

· Agencies should take full advantage of the Biannual Language Access Planning process to get input from OHR's Language Access team, the Mayor's ethnic constituency offices, and the DC Language Access Coalition.

· Ensure all translated documents are organized online by language so LEP/NEP customers and agency staff can easily access them. Publicizing 'language support' pages will create a trusted destination for LEP/NEP customers to connect with the agency in their language.

· Ensure all vital documents include multilingual tag lines instructing LEP/NEP customers to call for language support guarantees that documents not translated are still accessible to all audiences. This is a temporary measure agencies can easily implement by including tag lines in the agency's top ten encountered/likely to be encountered languages.



# Stakeholder Recommendations

## LEP/NEP Resident Recommendations

On June 21, 2014, OHR's Language Access Program hosted "DC Government Speaks Your Language," a citywide dialogue on language access and multilingual resource fair to celebrate the ten-year anniversary of the Language Access Act of 2004. Over 50 diverse LEP/NEP residents speaking nine different languages discussed their experiences and provided the following recommendations for improving access for LEP/NEP

- Ensure the District's diverse LEP/NEP residents are aware of their right to language assistance by using ethnic media and community-based organizations to increase public awareness.

- Provide in-language prompts for all District agencies' automated telephone services to facilitate navigation and access for LEP/NEP callers.

- Hire linguistically and culturally diverse DC government staff who can provide customer service that is culturally competent, sensitive and respectful to LEP/NEP communities.

> Top priorities amongst all stakeholders include hiring of more bilingual staff at agencies as well as increased cultural competency training for existing staff.

## Consultative Partners' Recommendation

The Language Access Act names the Mayor's Offices on African Affairs (OAA), Asian and Pacific Islander Affairs (OAPIA), and Latino Affairs (OLA) as consultative agencies, and the DC Language Access Coalition (LA Coalition) as an external stakeholder mandated to advise and assist OHR in the implementation of the Act. To the right are recommendations from these partners on priorities agencies should act on to improve access and quality of service provided to LEP/NEP individuals living, working, and conducting business in DC. Recommendations reflect the needs and experiences unique to each consultative agency's constituency, as well as those generated by the 40 plus diverse member organizations represented by the LA Coalition.

## Office on Latino Affairs (OLA)

· Provide all frontline employees with more Language Access trainings and resources.

· Prioritize new translations for legally binding forms, notices requiring an immediate response, and general resource guides.

· Translate and post multilingual signage.

· Promote available services and resources through more multilingual outreach.

## DC Language Access Coalition

· Provide recurring training for frontline staff and management on language access responsibilities and accessing resources.

· Ensure accurate data collection and distribution on both currently served and likely to be served LEP/NEP groups.

· Create a more linguistically inclusive environment within DCPS by assigning full time language coordinators at each school.

## Office on African Affairs (OAA)

· Improve access to services and programs for African communities by partnering with community-based organizations to provide linguistically and culturally targeted outreach to Amharic, French, Arabic and Tigrigna-speaking LEP/NEP residents.

· Improve website accessibility to LEP/NEP users by including Language Preference menus on agency homepages leading to translated documents, content and notifications for all languages.

## Office on Asian and Pacific Islander Affairs (OAPIA)

· Improve quality of translated documents in the Asian languages. Recurring issues include: mistranslation of words; words left untranslated; literal translations; and misused nouns and grammar.

· Market and publicize interpretation services as "Free and Fast" services to motivate participation.

· Improve data collection on population and services available to the AAPI population.

# FY14 Agency Compliance Scorecards

# Alcoholic Beverage Regulation Administration



**8/12**
overall compliance score



 FY14 Encounters
33

 FY13 Score
8/12

### FY14 Top Languages Encountered:
### Spanish, Amharic, Korean, Mandarin, Turkish, Cantonese

## preparedness
## 3/4

ABRA showed improvements by training staff and working proactively on planning and reporting requirements. Lack of comprehensive system for data collection remains a glaring gap in agency's preparedness.

## accessibility
## 2/5

ABRA conducted outreach to diverse audiences, but lack of translated vital documents continues to compromise agency's accessibility to LEP/NEP customers.

## quality
## 3/3

ABRA was not tested in FY14, and no complaints were filed against the agency in FY14.

The Alcoholic Beverage Regulation Administration (ABRA) reports that in FY14 it encountered a total of 33 LEP/NEP customers (primarily Spanish, Korean, and Amharic-speakers) based on data collected from sign-in sheets and language line usage reports. Given the ethnic and linguistic diversity of the District's hospitality and restaurant business community, LEP/NEP licensees are highly likely to interface with this agency for licensing, inspections, and other services. OHR strongly recommends that ABRA take immediate steps to implement a comprehensive system for tracking interactions with LEP/NEP customers at outreach events, inspections, and hearings for a more accurate picture of agency's encounters.

OHR credits ABRA for delivering nine multilingual workshops and trainings in FY14. However the lack of multilingual forms, notices, and instructions presents an ongoing barrier to access for LEP/NEP customers. OHR urges ABRA to prioritize key vital documents – such as the License Application Forms and Instructions – to be translated into top encountered, or likely to be encountered languages, and take swift action to ensure that these translations are available in both electronic and paper formats. Additionally, the agency should partner with the Mayor's ethnic constituency offices, and other immigrant serving organizations to more intentionally engage LEP/NEP communities and significantly increase contact with this population throughout FY15.

# Child and Family Services Agency



**12/12**
overall compliance
score



FY14 Encounters
1008

FY13 Score
11/12

## preparedness
## 4/4

CFSA is well prepared to serve LEP/NEP clients and regularly trains public contact staff. Agency should continue to refine data collection strategies to better track encounters with LEP/NEP customers

## accessibility
## 5/5

CFSA translated a total of 35 vital documents in FY14. Agency can improve its accessibility by making translated vital documents available on its website.

## quality
## 3/3

In FY14, no field testing was conducted at CFSA and no complaints were filed against the agency

### FY14 Top Languages Encountered:

Spanish, Amharic, Haitian Creole, Vietnamese, Chinese, Farsi, Mandarin, French, Burmese, and Tigrinya

OHR applauds the Child and Family Services Agency (CFSA) for its ongoing efforts to fully meet the compliance requirements of the Language Access Act and take proactive steps to facilitate meaningful access and inclusion of LEP/NEP residents. In FY14, the agency worked closely with the Language Access Program to successfully meet planning and reporting requirements.

CFSA translated 27 vital documents - including notification letters, investigation summaries, and assessment evaluations - into Spanish, five documents into Amharic, two documents into Korean and French, and one into Amharic, French, Vietnamese, Chinese, and Korean. OHR encourages the agency to continue pursuing translation of prioritized documents in other languages and to further improve accessibility of its website to LEP/NEP customers by centralizing links to non-confidential documents and resources on the 'language support' webpage for each language.

CFSA's fourth quarter report highlights 20 community events the agency participated in to engage diverse LEP/NEP groups. Two of these events specifically targeted Spanish, Amharic and French speaking LEP/NEP residents. OHR commends CFSA for its proactive efforts to partner with ethnic constituency offices to reach and serve diverse LEP/NEP communities.

# DC Housing Authority



**10/14**
overall compliance score





**In-Person Tests**
No in-person tests were conducted at DCHA.



**Telephone Tests**
4 out of 5 telephone tests provided the requested service, information or appropriate resources.

## preparedness
### 3/4

Agency successfully implemented electronic data collection on LEP/NEP encounters during FY13-14 BLAP period. Training of public contact staff remains a major preparedness priority.

## accessibility
### 5/5

DCHA's website is accessible in Spanish and includes online updates on housing applications. Agency should ensure translations in other languages are also available online.

## quality
### 2/5

One out of five telephone testers were turned away in FY14. Agency needs to improve quality of service to LEP/NEP customers.

**FY14 Encounters: 1,454   FY13 Score: 11/14**

**FY14 Top Languages Encountered:**

Spanish, Vietnamese, Amharic, Chinese, Korean, French, Swahili, Bengali, Thai, and Arabic

OHR recognizes the DC Housing Authority (DCHA) for installing telephones with dual headsets in two of its busiest customer service centers serving LEP/NEP customers. This investment will facilitate effective use of telephonic interpretation by frontline staff and improve customer service.

Based on FY14 testing results indicating that one out of five telephone testers was turned away for not speaking English, OHR advises the agency to consistently train public contact staff and cultivate agency's internal commitment to providing quality customer service and meaningful access to LEP/NEP customers.  As recommended previously in agency's FY13 scorecard, DCHA is encouraged to also train frontline staff on how to consistently and accurately track encounters with LEP/NEP customers in accordance with the Act. OHR looks forward to supporting the agency in implementing a rigorous FY15 plan for agency-wide trainings.

A section of the agency's website is available in Spanish with direct access to online application updates and other relevant information. For other languages that meet the legally required threshold, OHR advises the agency to provide a link to translated and uploaded vital documents on the 'language support' page for each language.

# DC Lottery and Charitable Games Control Board



## 5/12
### overall compliance score

**FY14 Encounters** 487

**FY13 Score** 5/12




### FY14 Top Languages Encountered:

Korean, Amharic, Hindi, Tigrinya, Punjabi, Chinese, Spanish, Urdu, Tagalog, Panis, and Yoruba

## preparedness
### 1/4

Without a reliable data collection strategy, and no efforts to train staff in FY14, the agency is not adequately prepared to provide language assistance to LEP/NEP customers.

## accessibility
### 2/5

While agency conducts outreach to reach LEP/NEP communities, the lack of translated vital documents presents a significant barrier to access.

## quality
### 2/3

Though no complaints have been filed against the agency, DCLB needs to make significant strides to improve services to LEP/NEP customers and retailers.

As a major public contact agency providing critical services, the DC Lottery and Charitable Games Control Board (DCLB) needs to take proactive steps to address ongoing compliance gaps and fulfill training, accessibility, reporting, and planning requirements of the Language Access Act.

In FY14, DCLB reported 487 LEP/NEP encounters solely on the basis of language line reports and retailers who identified a non-English language as their primary spoken language. OHR recommends the inclusion of other methods, such as the creation of new sign-in sheets and the implementation of an electronic tracking system, to ensure data on LEP/NEP encounters is documented. Data collection is a critical preparedness measure which will allow DCLB to understand the linguistic needs of its retailers and customers, and set guidelines for its translation efforts.

With only one document translated into Korean and none translated in the past two fiscal years, the translation of vital documents presents a critical gap in DCLB's accessibility. OHR strongly recommends DCLB prioritize the translation of the agency's core services and programs in top encountered languages, and review all documents to create a translation plan for FY15. In addition to translating documents, OHR encourages enhancing the accessibility of translated documents by uploading them to the agency website and providing a link on the 'language support' pages.

# DC Public Library



## 12/12
### overall compliance score

## preparedness
### 4/4

Agency has a comprehensive data collection mechanism and sufficiently trains public contact staff.

## accessibility
### 5/5

Availability of translated documents allows LEP/NEP residents to access agency's services and information in person and on the agency website.

## quality
### 3/3

No cases were filed against the agency in FY14. Agency was also not tested.



 **FY14 Encounters**
38,142

 **FY13 Score**
12/12

### FY14 Top Languages Encountered:

Spanish, Chinese, Amharic, French, Russian, Vietnamese, Italian, Portuguese, Korean, and Arabic

OHR applauds DC Publicy Library (DCPL) for its exceptional efforts to fully meet the requirements of the Language Access Act and take proactive steps to facilitate meaningful access and inclusion of LEP/NEP residents. DCPL worked closely with the Language Access Program on planning and reporting requirements, and successfully brought on a full-time Language Access Coordinator tasked with supporting the agency's compliance.

DCPL's comprehensive mechanism for data collection and reporting on LEP/NEP encounters relies primarily on Library Card Application forms and Language Line usage reports to identify the top non-English languages encountered by the agency. OHR acknowledges DCPL's exemplary commitment to understanding the linguistic needs of its customer base, which allows the agency to target translations accordingly, and work to make its programs and services accessible to LEP/NEP residents.

OHR also commends DCPL's consistent commitment to Language Access trainings and FY14 efforts to train 49 employees and all new hires on Language Access compliance and cultural competency.

OHR encourages DCPL to continue efforts to engage the District's increasingly diverse LEP/NEP population by ensuring that information on DCPL's events and activities are routinely translated and widely circulated.

# DC Public Schools



**10/14**
overall compliance
score

## preparedness

**3/4**

Agency collects comprehensive data on LEP/
NEP encounters. Adoption of a language access
policy and agency-wide training remain top
preparedness priorities for DCPS.

## accessibility

**4/5**

Agency has translated 59 vital documents in
FY13/14; however the DCPS Parent Handbook
remains the only translated document
currently accessible on the agency's website.

## quality

**3/5**

No complaints were filed against DCPS in FY14.
7 out of 17 telephone testers were turned away
during tests.



## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

 **In-Person Tests**
All 23 in-person field tests
provided the requested service,
information or appropriate
resources.

 **Telephone Tests**
Only 7 out of 17 telephone tests
provided the requested service,
information or appropriate
resources.

**FY14 Encounters: 8,868    FY13 Score: 10/14**

### FY14 Top Languages Encountered:

Spanish, Amharic, Chinese, French, Vietnamese, Russian,
Arabic, Tagalog, Bengali, and Igbo

OHR credits DC Public Schools (DCPS) for FY14 results of the in-person field tests, which show all 23 in-person tests at eight DCPS schools were provided adequate language assistance and received requested information and resources. However, field tests conducted over the phone indicated that in roughly 60 percent of calls made by testers, callers were not provided with language assistance or information - i.e. calls were hung-up, and testers were told they couldn't be assisted.

OHR reiterates FY13 recommendations and urges DCPS to take immediate steps to implement a phased plan for training central office staff and school personnel on language access requirements. English Language Learners comprise one of the fastest-growing groups in the country, and schools are increasingly linguistically diverse, so DCPS cannot afford another year without training personnel and administrative staff on the legal obligation to provide language assistance to students and parents.

OHR stresses that DCPS should accelerate language access compliance efforts in FY15 and equally prioritize: a) adoption of an internal language access policy; b) designation of Language Access Points of Contacts in schools that have a large English Language Learner student population; and c) centralizing all translated vital documents on its website.

# Department of Behavioral Health



## 10/12
overall compliance score



 FY14 Encounters
9,336

 FY13 Score
10/12

### preparedness
## 3/4

Reliable mechanism for data collection was implemented. With agency-wide training of staff, DBH will be well-positioned to successfully meet the needs of its LEP/NEP customers.

### accessibility
## 4/5

Translated vital documents reflect LEP/NEP customers' needs. More efforts are needed to improve accessibility of translated documents online.

### quality
## 3/3

No complaints have been filed against DBH in FY14. Agency has shown improvements in its implementation of LA.

### FY14 Top Languages Encountered:
**Spanish, Amharic, Vietnamese, Creole, Chinese, Korean, Mandarin, and Urdu**

OHR recognizes and supports the Department of Behavioral Health (DBH) for its FY14 efforts to improve LEP/NEP data collection. It successfully incorporated a language preference drop-down menu into its customer tracking system as an additional mechanism for tracking encounters with LEP/NEP customers. Agency's quarterly reports to OHR also provide data on Language Line and live interpretation use by grantees and public service organizations who provide services on behalf of DBH. These steps ensure comprehensive tracking of LEP/NEP encounters, and allow DBH to be better prepared to serve multilingual customers in their language.

In FY14, DBH translated nine documents - including a set of consent forms and agency helpline cards recommended for translation in the FY13 scorecard - into languages reflecting the needs of the LEP/NEP population. OHR acknowledges DBH's ongoing translation efforts and recommends it enhance document accessibility by centralizing them on its website and by providing a link on the 'language support' pages for each language.

OHR commends the great efforts made by the agency to fulfill requirements of the Language Access Act and work diligently to improve quality of services to LEP/NEP customers. OHR encourages DBH to provide training to frontline staff in FY15 to increase cultural competency and Language Access awareness within the agency.

# Department of Consumer and Regulatory Affairs



**10/14**
overall compliance score



**DEPARTMENT OF CONSUMER & REGULATORY AFFAIRS**



### In-Person Tests
13 out of 14 in-person field tests provided the requested service, information or appropriate resources.



### Telephone Tests
Only 6 out of 15 telephone tests provided the requested service, information or appropriate resources.

FY14 Encounters: 623    FY13 Score: 11/14

**FY14 Top Languages Encountered:**

Amharic, Vietnamese, Spanish, French, Mandarin, Portuguese, Urdu, Korean, and Haitian

## preparedness
### 3/4

DCRA currently relies on Language Line usage reports as its main source for reporting LEP/NEP encounters. Agency needs to refine data collection mechanism.

## accessibility
### 4/5

Agency conducts outreach to LEP/NEP communities. However very few translated vital documents are available on DCRA's website.

## quality
### 3/5

No complaints were filed against agency in FY14. Four (4) telephone testers were turned away during tests.

OHR notes the strong score the Department of Consumer and Regulatory Affairs (DCRA) received on in-person field tests conducted in its service centers in FY14. However, only 40 percent of telephone tests resulted in testers receiving the service or information they requested, while in 60 percent of the tests, the agency employees hung-up on testers and/or told them they were unable to help. In light of these results, OHR urges DCRA to take proactive steps to monitor the quality and accessibility of customer service provided to LEP/NEP callers over the phone, and prioritize agency-wide training in FY15 to ensure all public contact staff are aware of and equipped to fulfill their legal obligation to provide language assistance.

In FY13 DCRA reported translation of 24 vital documents into the top six languages. OHR recommends the agency upload already translated documents and resources on its website by centralizing links on the 'language support' page for each language.

In addition, as OHR indicated in the agency's FY13 compliance review, DCRA needs to assess and refine its data collection mechanism and tracking of LEP/NEP customers; for instance ensuring encounters with professional interpreters, bilingual personnel, and other frontline staff are tracked via the main agency customer tracking system.

# Department of Corrections





## 11/12
### overall compliance score

 FY14 Encounters
351

 FY13 Score
11/12

## preparedness
### 3/4

DOC should take steps to enhance data collection mechanism and provide agency-wide language access compliance trainings to ensure DOC is fully prepared to serve LEP/NEP customers and inmates.

## accessibility
### 5/5

OHR credits DOC for online availability of vital documents in Spanish, and agency's outreach efforts in FY14. DOC needs to improve agency's accessibility in other top languages encountered by the agency.

## quality
### 3/3

No field tests were conducted at DOC, and no complaints were filed against the agency in FY14.

### FY14 Top Languages Encountered:

Spanish, Amharic, French, Arabic, Italian, Korean, Portuguese, Bengali, Russian, and Turkish

OHR commends the Department of Corrections (DOC) for its efforts in FY14 to meet the requirements of the Language Access Act, and for successfully implementing a team-based model to achieve these outcomes. OHR also credits the agency for translating 12 vital documents into Spanish in FY14, and for making them accessible under a dedicated tab on the agency's website for information and documents in Spanish. OHR recognizes these efforts to ensure accessibility to Spanish-speaking LEP/NEP customers, and encourages DOC to make similar efforts to translate and centralize vital documents in other top languages encountered by the agency.

DOC reports 351 encounters with LEP/NEP customers mainly captured through JACCS, DOC's case management system, which documents inmate information during intake. OHR advises DOC to enhance data collection strategies to ensure encounters with LEP/NEP customers and inmates are well documented. Including additional data points - such as the language line usage reports and self-reported language information on sign-in sheets - will ensure that agency is aware of, and can adequately respond to the full scope of interactions with LEP/NEP customers and inmates.

In FY15, OHR recommends DOC partner with the Language Access Program to provide agency-wide training on language access compliance.

# Department on Disability Services



## 9/12
### overall compliance score



 FY14 Encounters
512

 FY13 Score
8/14

### FY14 Top Languages Encountered:

Spanish, Amharic, Vietnamese, Mandarin, French, Portuguese, Korean, Arabic, Karen, and Hindi

## preparedness
### 4/4

DDS staff is well prepared to serve LEP/NEP customers. Agency should continue refining mechanisms for collecting and centralizing data on LEP/NEP encounters.

## accessibility
### 3/5

Translating vital documents into languages beyond Spanish, and making translations available online would improve agency's overall accessibility.

## quality
### 2/3

No field tests were conducted at DDS, and no complaints were filed against the agency in FY14.

OHR acknowledges proactive steps the Department on Disability Services (DDS) has taken since FY13 to enhance the agency's linguistic and cultural competency: hiring bilingual staff now poised to provide in-person interpretation to LEP/NEP customers; assigning a dedicated bilingual staff to its intake office; training public contact staff on language access compliance and cultural competency; and instituting a form for bilingual staff to capture interactions with LEP/NEP individuals.

In FY14, DDS translated 28 vital documents - toolkits, intake forms, brochures, and reference cards - into Spanish. OHR notes the agency's investment, and recommends translation of these vital documents into all top encountered languages. Translated vital documents should also be made available online on the 'language support' page for each language.

As OHR indicated in the agency's FY13 compliance review, DDS should assess and refine its data collection mechanism and tracking of LEP/NEP customers. DDS reported 410 less encounters in FY14 compared to FY13. Although DDS explains a growing reliance on bilingual staff reduced language line usage, the encounters reported from bilingual staff tallies do not compensate entirely for the sharp decrease overall encounters. OHR encourages DDS to adopt an efficient system for collecting data from bilingual staff, and for ensuring all LEP/NEP customers are tracked.

FY14 Language Access Annual Compliance Review

# Department of Employment Services



**9/14**
overall compliance score

## preparedness
### 3/4

OHR urges DOES to better prepare for serving LEP/NEP customers by instituting a reliable system for tracking LEP/NEP customers and encounters, and by providing language access and cultural competency training for all staff.

## accessibility
### 3/5

OHR urges DOES to translate vital documents into frequently encountered languages other than Spanish and ensure the District's linguistically diverse job seekers, businesses, and residents can access critical services.

## quality
### 3/5

Telephone field test results indicate agency should improve in providing assistance via phone.



DEPARTMENT OF EMPLOYMENT SERVICES



**In-Person Tests**
All of the 12 in-person field tests provided the requested service, information or appropriate resources.



**Telephone Tests**
8 out of 14 telephone tests provided the requested service, information or appropriate resources.

**FY14 Encounters: 13,271   FY13 Score: 11/14**

**FY14 Top Languages Encountered:**

Spanish, Amharic, Chinese, Korean, Vietnamese, Portuguese, French, Tigrinya, Arabic, and Japanese

OHR commends DOES for the perfect score received on in-person field tests that were conducted in its Office of Wage and Hour, Office of Worker's Compensation, and three of its American Job Centers. However, telephone test results indicated that in more than 40 percent of tests LEP/NEP customers did not receive the requested service or information (agency employees hung-up on testers and/or told them they are unable to help). In light of these results, OHR recommends DOES closely monitor language support gaps for LEP/NEP customers over the phone, and train all frontline staff on language access compliance requirements.

In FY14, DOES completed Spanish translation of two vital documents (the 'DC Minimum Wage' poster and 'Accrued Sick and Save Leave Act' documents) which were disseminated to over 30,000 businesses in the District. Given DOES's frequent encounters with diverse LEP/NEP customers who speak other languages besides Spanish, it is imperative that the agency secure resources to replicate translation and outreach efforts with other languages that meet the legally-mandated threshold.

# Department of Health



**8/14**
overall compliance
score



GOVERNMENT OF THE DISTRICT OF COLUMBIA

**DOH**

**DEPARTMENT OF HEALTH**
Promote. Prevent. Protect.



### In-Person Tests
8 out of 12 in-person field tests provided the requested service, information or appropriate resources.



### Telephone Tests
Only 1 out of 13 telephone tests provided the requested service, information or appropriate resources.

**FY14 Encounters: 15,337    FY13 Score: 8/14**

**FY14 Top Languages Encountered:**

Amharic, Spanish, French, Chinese, Cantonese, Korean, Tigrinya, Portuguese, Urdu, and Swahili

## preparedness
### 3/4

DOH can be better prepared to serve LEP/NEP customers by streamlining data collection, reporting comprehensive data to OHR, and taking immediate action to train all agency and service provider staff on language access.

## accessibility
### 3/5

While DOH took steps to translate a number of vital documents in FY14, agency should take steps to centralize these documents on its website and track translation efforts by its grantees and providers.

## quality
### 2/5

No complaints were filed against DOH in FY14. However field testing results point to real concerns in the quality of service provided to LEP/NEP customers, particularly over the phone.

OHR recognizes improvements in FY14 in-person field testing results (compared to FY13 results) indicating tested DOH service provider sites (i.e. Community Connections, Vital Records Division, Whitman Walker Clinic, etc.) offered adequate language assistance. However, more than 92 percent of the telephone tests conducted at these sites indicate LEP/NEP customers were systematically denied access, and were not provided the requested services and/or information. OHR advises DOH to take immediate steps to train all of its service providers on language access compliance and closely monitor the quality of customer service provided to LEP/NEP customers over the phone.

As DOH-funded service providers are a vital point of entry for thousands of LEP/NEP customers who interface with the agency every year, DOH must place significant focus on ensuring that its providers fully comply with the Language Access Act by capturing data on encounters with LEP/NEP customers, training all public contact staff, translating vital documents, and routinely reporting their progress back to DOH. OHR reiterates recommendations made in FY13 for the agency to improve overall reporting, and provide OHR with comprehensive and disaggregated data.

FY14 Language Access Annual Compliance Review

# Department of Housing and Community Development



## 8/14
overall compliance score

## preparedness
## 3/4

Refining mechanism for collecting LEP/NEP encounters from DHCD and grantee locations would improve agency's overall preparedness to serve its LEP/NEP customers.

## accessibility
## 2/5

While DHCD conducts aggressive outreach, no vital documents have been translated by the agency since 2010. OHR urges immediate action to address this gap.

## quality
## 3/5

No complaints were filed against DHCD in FY14. Field test results indicate the agency provided quality in-person service and acceptable telephone-based assistance to LEP/NEP customers.





### In-Person Tests
All of the 5 in-person field tests provided the requested service, information or appropriate resources



### Telephone Tests
5 out of 6 telephone tests provided the requested service, information or appropriate resources.

FY14 Encounters: 977   FY13 Score: 8/12

### FY14 Top Languages Encountered:

Spanish, French, Vietnamese, Amharic Chinese, and Korean

OHR applauds the Department of Housing and Community Development (DHCD) on FY14 field tests results indicating all but one tester were provided adequate language assistance and received the information requested in their language. Of the six telephone tests conducted at DHCD's Housing Resource Center, one caller was unable to receive assistance because the employee hung up the call. OHR recommends DHCD closely monitor customer service provided to non-English speakers, and train frontline staff to reinforce equitable service for LEP/NEP customers.

Given the agency's targeted mission to revitalize underserved communities, and its existing partnership with immigrant-serving community-based grantees to deliver services, it is imperative comprehensive data collection and customer tracking be in place to ensure all LEP/NEP encounters are documented by DHCD and its grantees. OHR instructs the agency to prioritize streamlining data collection by a) systematically recording primary languages data during first encounters with LEP/NEP customers at all DHCD and grantee locations; b) including language access and data collection provisions in DHDC RFAs and grants; and c) requiring all bilingual staff at DHCD and grantee locations to tally language assistance provided.

OHR recommends DHCD take immediate steps to translate relevant vital documents that were slated for translation in agency's FY13-14 BLAP.

# Department of Human Resources



**12/12**
overall compliance
score



 FY14 Encounters
36

 FY13 Score
11/12

## preparedness
### 4/4

Agency trained all employees including new hires in FY14. All preparedness requirements were met in FY14.

## accessibility
### 5/5

Translated vital documents reflected LEP/NEP clients' needs and are easily accessible on agency's website.

## quality
### 3/3

No complaints were filed against DCHR in FY14. Steady improvement has been observed in language access implementation.

### FY14 Top Languages Encountered:
Spanish, French, Korean, Turkish, and Tagalog

OHR applauds the Department of Human Resources (DCHR) for its ongoing efforts to fully meet the requirements of the Language Access Act. In FY14, DCHR worked with the Language Access Program to provide seven trainings on Language Access and Cultural Competency and ensured that all agency staff, including new hires, were trained. DCHR was equally proactive in meeting outreach requirements by participating in community events and by partnering with OHR in the planning and implementation of 'DC Speaks Your Language' LEP/NEP community forum in June 2014.

DCHR reports minimal encounters with LEP/NEP customers, as the agency interacts primarily with District government employees and English-proficient job seekers. Still, DCHR is working to ensure that appropriate signage and meaningful language support are available for LEP/NEP job seekers and residents who do call or visit the agency's customer service and professional development center.

OHR encourages DCHR to continue supporting citywide language access implementation in the coming fiscal year by facilitating citywide trainings on language access and cultural competency through its Center for Learning and Development, and by supporting agencies in attracting and recruiting bilingual talent.

FY14 Language Access Annual Compliance Review

# Department of Human Services



**7/14**
overall compliance
score

## preparedness
### 4/4

DHS has a comprehensive system in place for identifying and tracking LEP/NEP encounters. Instituting rigorous language access and cultural competency trainings for all frontline staff is needed to strengthen preparedness.

## accessibility
### 3/5

DHS' website is currently inaccessible to LEP/NEP customers. Agency can mitigate this by uploading translated documents under its 'language support' web pages.

## quality
### 0/5

Three complaints were filed against DHS and agency was found in non-compliance in all cases. While field testing results improved, almost half of the tests were met with inadequate quality of service.



DC DEPARTMENT of HUMAN SERVICES



**In-Person Tests**
16 out of 19 in-person field tests provided the requested service, information or appropriate resources.



**Telephone Tests**
Only 3 out of 16 telephone tests provided the requested service, information or appropriate resources.

**FY14 Encounters: 17,333    FY13 Score: 7/14**

**FY14 Top Languages Encountered:**

Spanish, Amharic, Mandarin, Cantonese, French, Vietnamese, Arabic, Portuguese, Tigrinya, and Korean

OHR credits the Department of Human Services (DHS) for slight improvements in service quality observed in FY14 field test results conducted at select service centers (Fort Davis, Anacostia, Taylor St., H St., and Childcare and Adult Protective Services). However, only 20 percent of telephone tests and 85 percent of in-person tests received adequate language assistance or requested services. In other tests, language assistance was denied as employees hung-up on the tester, or told testers they were unable to help.

These results - along with the three FY14 public complaints for which DHS was found in non-compliance - point to systemic barriers preventing LEP/NEP residents from accessing DHS services. As an agency tasked with providing protection and critical social services for our most vulnerable populations, these barriers have dire consequences for LEP/NEP families who are denied meaningful access. OHR once again urges DHS to take serious measures in FY15 to address persistent gaps in compliance.

OHR acknowledges FY14 improvements made in public education and outreach, internal training of public contact staff, and translation of 16 vital documents into Spanish. In FY15, the agency should translate vital documents into other languages meeting the legally mandated threshold, and ensure translated documents are accessible on the DHS website.

FY14 Language Access Annual Compliance Review

# Department of Motor Vehicles



**10/14**
overall compliance
score

## preparedness
### 4/4

DMV collects comprehensive data on encounters with LEP/NEP customers and trained all front-line staff on Language Access compliance requirements and Cultural Competency.

## accessibility
### 5/5

DMV has translated 13 of its vital documents into 6 languages and made them available on its website. Agency conducted outreach to LEP/NEP communities.

## quality
### 1/5

One complaint was filed against the DMV and the agency was found in non-compliance. Testing results indicate quality of customer service remains an area of improvement for the agency.





**In-Person Tests**
14 out of 18 in-person field tests provided service, information or appropriate resources.



**Telephone Tests**
No telephone tests were conducted at DMV

**FY14 Encounters: 4,025    FY13 Score: 9/14**

**FY14 Top Languages Encountered:**

Spanish, Amharic, Chinese, French, Arabic, German, Portuguese, Vietnamese, Italian, and Korean

OHR credits the Department of Motor Vehicles (DMV) for taking steps to better meet requirements and for working closely with OHR to fulfill training, outreach, reporting, and planning requirements.

DMV translated 13 of its most requested vital documents in FY14, including those related to the implementation of the Limited Purpose credentials. Nevertheless, OHR encourages DMV to further improve accessibility of its website to LEP/NEP customers by centralizing links to translated and already uploaded vital documents on the 'language support' pages.

During FY14, DMV did exceptional work in providing language access compliance trainings internally for over 200 public contact staff with some OHR-led cultural competency trainings. However, three field testers were turned away without language assistance and a complaint was filed against DMV for which the agency was found in non-compliance, so OHR urges DMV to issue clearer directives and offer additional training to front-line staff to boost its commitment to quality and inclusive customer service.

OHR recommends DMV take steps to ensure all service centers display effective multilingual signage to inform LEP/NEP customers about language assistance and orient them on the agency's service delivery process.

# Department of Parks and Recreation



**10/12**
overall compliance
score



DC DEPARTMENT OF PARKS AND RECREATION

 FY14 Encounters
1,638

 FY13 Score
8/12

**FY14 Top Languages Encountered:**

Spanish, Amharic, French, Russian, German, Chinese, Italian, Vietnamese, Korean, and Farsi

## preparedness

### 3/4

Instituting a comprehensive and reliable data collection mechanism remains a top priority for DPR without which the agency will not be equipped to understand the needs of its service population

## accessibility

### 4/5

Agency shows progress in availability of translated documents. Expanding translations beyond Spanish to reflect top languages, and centralizing documents, would boost agency's accessibility.

## quality

### 3/3

No complaints were filed against the agency in FY14. No field tests were conducted this year.

OHR credits the Department of Parks and Recreation (DPR) for proactive efforts in FY14 to engage LEP/NEP residents and to make the city's parks and recreation centers more welcoming community spaces. The agency worked closely with the Language Access Program on the implementation of the 'DC Speaks Your Language' forum for LEP/NEP residents, and partnered with the Mayor's ethnic constituency offices, and community partners to attract and hire bilingual employees.

DPR reports 1638 LEP/NEP customers in FY14 and 1,942 customers who have indicated non-English language preferences in its automated registration system. This data is solely collected through program registrations, and does not account for LEP/NEP residents who visit individual sites and centers. DPR should take immediate steps to institutionalize a comprehensive data collection strategy for capturing all encounters - across its many parks, centers and programs – in a consistent and reliable manner.

OHR credits DPR for training all DPR staff on language access for a second year in a row.  Given the increased LEP/NEP encounters reported in the last year, the agency needs to continue efforts to attract bilingual staff, cultivate real partnerships with diverse immigrant-serving organizations, and enhance its internal cultural and linguistic capacity to match the needs of an increasingly diverse LEP/NEP population.

# Department of Public Works



**10/12**
overall compliance score



"The Preferred Choice"

 FY14 Encounters
239

 FY13 Score
10/12

## preparedness
### 3/4

DPW is adequately prepared to serve LEP/NEP customers, but could be better equipped by broadening data sources and by training all public contact staff on language access compliance requirements.

## accessibility
### 5/5

DPW translated four vital documents into Spanish in FY 14. Agency should take steps to translate these same documents, and other prioritized vital documents into top encountered languages.

## quality
### 2/3

No field tests were conducted at DPW in FY14, and no complaints were filed against the agency.

### FY14 Top Languages Encountered:
Spanish, Chinese, French, and Korean

In FY14, Department of Public Works (DPW) translated four vital documents (flyers and brochure) into Spanish and uploaded them to the agency website. OHR credits the agency for these efforts, and encourages DPW to submit a list of agency vital documents and pursue translation of prioritized documents into other languages that meet the legally mandated threshold. The agency can further improve the accessibility of its website to LEP/NEP customers by centralizing links to uploaded translated documents on the 'language support' page for each language.

DPW reports 239 encounters with LEP/NEP customers in FY14, which reflects a slight increase compared to the agency's 157 encounters in FY13. While quarterly reports submitted to OHR indicate that the agency is capturing data through a combination of methods, FY14 encounters appear to rely mainly on Language Line usage reports. OHR urges DPW to put mechanisms in place to collect data from multiple sources and ensure that reported encounters fully capture all contact the agency has with LEP/NEP individuals.

In FY15, OHR encourages DPW to plan ahead and schedule language access trainings that accommodate employees who work non-traditional shifts, and ensure all front-line personnel receive training by the end of the fiscal year.

FY14 Language Access Annual Compliance Review

# Department of Small and Local Business Development



## 8/14
### overall compliance score

**DSLBD**
DC Department of Small & Local Business Development


**In-Person Tests**
2 out of 4 in-person field tests provided the requested service, information or appropriate resources.


**Telephone Tests**
2 out of 4 telephone tests provided the requested service, information or appropriate resources.

FY14 Encounters: 6    FY13 Score: 3/12

FY14 Top Languages Encountered:

Spanish, French, and Korean

## preparedness
### 2/4

Collecting data from grantees and training all DSLBD and grantee staff on language access compliance requirements would significantly improve agency's preparedness to serve LEP/NEP customers.

## accessibility
### 3/5

Translation of key vital documents and proactive outreach to LEP/NEP business owners are two critical steps DSLBD needs to take in FY15 to improve agency's accessibility.

## quality
### 3/5

While no complaints were filed against the agency in FY15, field testing results indicate agency needs to significantly improve customer service for LEP/NEP customers.

OHR credits the Department of Small and Local Business Development (DSLBD) for its increased commitment to Language Access implementation, and significant strides in FY14 to bring the agency into greater compliance with the Language Access Act.  FY14 field test results indicate that 50 percent of both in-person and telephone tests conducted at the agency did not provide the requested service or information. In light of these results, and compliance gaps identified in agency's FY13 scorecard, DSLBD must take action to improve overall preparedness and ensure all agency and grantee staff are trained on Language Access requirements and prepared to serve LEP/NEP-owned businesses and customers.

DSLBD reported only six LEP/NEP encounters in FY14. Given the significantly large immigrant and LEP/NEP-owned businesses represented in the District, OHR encourages DSLBD to reinforce data collection and reporting requirements for its grantees and service providers, and conduct targeted outreach to engage LEP/NEP-owned businesses and communities. In FY15, DSLBD needs to prioritize additional vital documents – such as instructions and forms related to CBE certification – for translation based on LEP/NEP customers encountered or likely to be encountered by the agency.

# Department of the Environment



**11/12**
overall compliance score



 **FY14 Encounters**
1,690

 **FY13 Score**
12/12

## preparedness
## 4/4

DDOE is well prepared to serve LEP/NEP clients through its well-trained staff and comprehensive tracking of encounters with LEP/NEP customers.

## accessibility
## 4/5

DDOE translated 10 vital documents in FY 14 and participated in 6 community events to engage LEP/NEP communities.

## quality
## 3/3

No field testing was conducted at DDOE in FY14, and no public complaints were filed against the agency.

### FY14 Top Languages Encountered:

**Spanish, Cantonese, Chinese, Amharic, Korean, Vietnamese, Arabic, Tagalog, Tigrinya, and Portuguese**

OHR applauds the District Department of the Environment (DDOE) for its proactive efforts to meet requirements and to facilitate meaningful access and inclusion of LEP/NEP residents. DDOE's FY14 accomplishments include capturing LEP/NEP encounters comprehensively using varied data sources; coordinating with the Language Access Program to train all public contact and senior managers on language access and cultural competency; and actively engaging LEP/NEP communities through six community events the agency participated in to provide linguistically-targeted information.

In FY14, DDOE translated seven vital documents including notices, letters, and forms into Spanish; and three into Amharic, Chinese and Spanish. OHR encourages the agency to continue translating documents prioritized during the FY13/14 BLAP period into other languages that meet the threshold and to further improve accessibility of its website to LEP/NEP customers by centralizing links to in-language documents and resources on the 'language support' page for each language.

OHR recommends DDOE continue outreach efforts in FY15 to ensure that LEP/NEP residents and businesses are accessing key DDOE services – such as the Solar Advantage Plus Program - and participate in agency's environmental education programs.

# Department of Transportation



**11/12**

overall compliance score



### District Department of Transportation

 FY14 Encounters
73

 FY13 Score
10/12

## preparedness

### 4/4

Continued language access compliance trainings and improved mechanism for collecting data on LEP/NEP encounters will ensure that agency is prepared to serve LEP/NEP customers.

## accessibility

### 4/5

DDOT translated six vital documents into Spanish. Agency should prioritize translation of additional vital documents into top languages encountered in FY14.

## quality

### 3/3

No field tests were conducted at DDOT in FY14, and no complaints were filed against this agency

### FY14 Top Languages Encountered:

Spanish, French, Amharic, Chinese, Vietnamese, and Korean

OHR recognizes the District Department of Transportation (DDOT) efforts in FY14 to meet compliance requirements of the Language Access Act, and credits the agency for working with the Language Access Program to train 77 public employees on language access compliance and for participating in seven community events targeting, Spanish, Tagalog, Cantonese and Mandarin-speaking residents, among others.

DDOT reports 73 encounters in FY14. While the agency has made steady progress on tracking LEP/NEP customers by capturing encounters through sign-in sheets, Language Line usage reports, and records from bilingual staff, instituting a comprehensive and reliable data collection strategy remains a critical gap in compliance for the agency. OHR advises DDOT to consider its business processes, and identify new methods for recoding and tracking LEP/NEP encounters to ensure that the language needs of its customers are accurately documented and addressed.

In FY15, DDOT is encouraged to continue efforts to train its staff - including its field staff, and the 22 public service organizations that provide education and transportation services on behalf of the agency - to ensure that they are equipped to serve LEP/NEP customers.

# Fire and Emergency Medical Services



**4/14**
overall compliance score





**In-Person Tests**
None of the 7 in-person field tests provided the requested service, information or appropriate resources.



**Telephone Tests**
None of the 5 telephone tests provided the requested service, information or appropriate resources.

## preparedness
## 2/4

Creating an effective data collection mechanism, training public contact staff, and cultivating internal buy-in, are critical gaps FEMS must address in order to be prepared to serve LEP/NEP residents.

## accessibility
## 1/5

FEMS reports 42 instances where Language Line was used. Agency needs to translate vital documents and equip all first responders with access to phone-based interpretation in the field to ensure that agency's services are accessible to LEP/NEP customers.

## quality
## 1/5

FY14 testing results indicate agency has to take immediate steps to transform and improve customer service provided to LEP/NEP customers.

**FY14 Encounters: 42     FY13 Score: 2/14**

**FY14 Top Languages Encountered:**

Spanish, Amharic, Mandarin, Korean, Vietnamese, Russian, Arabic, French, Tagalog and Thai

FY14 field test conducted at Fire and Emergency Medical Services (FEMS) indicate no testers were provided language assistance. FEMS is an agency with major public contact that is charged with providing critical emergency and safety services to the public. There are potentially dire consequences to the glaring compliance gaps exhibited by the agency with respect to Language Access implementation. Persistent gaps in compliance have not been addressed by agency leadership.

During FY14 OHR issued a memo listing chronic areas of non-compliance at FEMS and urged the agency to take action on four baseline language access compliance requirements, such as submission of bi-annual plan, FY14 reporting, training of staff and attendance at mandatory meetings. OHR encourages the agency to follow through on efforts to address these gaps, and on commitments made during FEMS leadership meeting with OHR to implement effective data collection methods for tracking LEP/NEP encounters.

# Homeland Security and Emergency Management Agency



**12/14**
overall compliance score



In-Person Tests

Only 1 out of 4 in-person field tests provided the requested service, information or appropriate resources



Telephone Tests

All of the 4 telephone tests provided the requested service, information or appropriate resources.



FY14 Encounters: 138   FY13 Score: 10/12

**FY14 Top Languages Encountered:**

Spanish, Amharic, Chinese, Vietnamese, Korean, Thai, Tigrinya, Russian, and German

## preparedness

**3/4**

Identifying additional sources of data (beyond Language Line usage reports and sign-in sheets) will allow agency to better track LEP/NEP encounters and get a better picture of the linguistic needs of the LEP/NEP population HSEMA is encountering or likely to encounter.

## accessibility

**5/5**

One vital document translated and uploaded on agency website in FY14. Without translated vital documents, LEP/NEP residents will be unable to access critical information on emergency preparedness and safety.

## quality

**4/5**

FY14 in-person field test results indicate improvements need to be made to HSEMA's customer service to LEP/NEP customers at the main office.

OHR commends Homeland Security and Emergency Management Agency (HSEMA) for a perfect score on FY14 telephone field tests conducted at the main office. While all testers who called the agency were offered adequate in-language assistance, three in-person testers were not provided the requested service or information. Based on these results, OHR recommends HSEMA take immediate steps to train front-line staff assigned to receive customers on a walk-in basis, and ensure the agency's reception areas and entry points are equipped to serve LEP/NEP customers.

In FY14, HSEMA uploaded one translated vital document on the agency's website, and one of its vital documents, 'Shelter-in-Place' is now available electronically in the top six languages encountered by the agency. OHR encourages HSEMA to pursue translation of prioritized vital documents and ensure that key documents on emergency preparedness are available to LEP/NEP residents in a language they can understand, and further improve accessibility of its website to LEP/NEP customers by providing links to translated documents on the 'language support' page for each language.

# Metropolitan Police Department



**11/14**
overall compliance score

## preparedness
### 4/4

MPD is well prepared to serve LEP/NEP customers and has put satisfactory systems in place for effective data collection and staff training.

## accessibility
### 5/5

Although agency can improve on accessibility of translated documents on agency's website, MPD consistently translates documents in languages that reflect the needs of the population it serves.

## quality
### 2/5

Field testing results and recurring public complaints point to a major gap in MPD's ability to provide quality services to LEP/NEP customers.





**In-Person Tests**
10 out of 12 in-person field tests provided the requested service, information or appropriate resources.



**Telephone Tests**
6 out of 11 telephone tests provided the requested service, information or appropriate resources.

**FY14 Encounters: 4,692    FY13 Score: 13/14**

**FY14 Top Languages Encountered:**

Spanish, Mandarin, Vietnamese, Amharic, Korean, French, Cantonese, Japanese, Thai, and Chinese

OHR recognizes Metropolitan Police Department (MPD) for sustained and overall effective efforts to comply with requirements and for proactive work on systemic corrective actions identified by OHR. OHR also credits MPD for working closely with the agency to successfully fulfill planning and reporting requirements, and partner on LEP/NEP outreach initiatives.

In light of FY14 field testing results, in which almost half of telephone tests conducted at MPD did not provide language assistance, and three complaints filed against MPD in FY14, OHR urges the agency to focus on quality of service provided to LEP/NEP customers. In FY15, OHR recommends MPD accelerate efforts to partner with OHR in delivering instructor-led training for all frontline staff, and utilize roll calls and other administrative mechanisms to reinforce agency's overall commitment to quality and inclusive service.

In FY14, MPD reported translating 13 documents and publications into six languages, 3 documents into Spanish, and one into Urdu and Chinese. OHR encourages the agency to continue translation of prioritized documents, and implement plans to improve accessibility of its website to LEP/NEP customers by centralizing links to all translated documents on the 'language support' page for each language.

# Office on Aging



**10/12**
overall compliance score



 FY14 Encounters
2,605

 FY13 Score
9/12

## preparedness
## 3/4

While OA has instituted a comprehensive data collection mechanism, agency should refine its process to better track data on emerging encountered languages.

## accessibility
## 4/5

Interpretation services were provided and documents were translated. However better accessibility could be achieved by making translated documents centrally available on agency's website.

## quality
## 3/3

OA was not tested in FY14 and no complaints were filed against the agency in FY14.

### FY14 Top Languages Encountered:

Spanish, Chinese, Korean, Amharic, Vietnamese, French, Tigrinya, Armenian, Arabic, and Tagalog

OHR credits the Office on Aging (OA) for significant efforts made in FY14 to serve the District's LEP/NEP senior population: working with the LA program to convene and train its service providers on Language Access compliance requirements; training new hires and public contact staff; and conducting targeted outreach to reach linguistically diverse LEP/NEP communities.

OHR also acknowledges OA's ongoing efforts to translate vital documents into languages that reflect the needs of its LEP/NEP customers, and the steps the Language Access team takes to review and verify the quality of translations. OA can improve accessibility of its website by uploading translated documents under the 'language support' page for each language. This would make it easier for LEP/NEP customers to access electronic documents in their language, and also make the documents centrally available for OA staff and community-based partners to use.

In FY15, OA should prioritize refining its data collection mechanism. To date, OA has primarily relied on data collected from sign-in sheets and language line usage reports to document LEP/NEP encounters. OHR highly recommends the inclusion of other methods - capturing language information on customer tracking software, and requiring bilingual staff to tally interactions with LEP/NEP customers - to ensure it is continuously tracking trends and changes in the language needs of the senior population.

# Office of Contracting and Procurement



**8/12**
overall compliance
score



   FY14 Encounters
8

   FY13 Score
8/12

## preparedness
### 3/4

OCP would be better prepared to serve LEP/
NEP customers once all public contact staff
in the agency are trained on language access
requirements and resources.

## accessibility
### 3/5

Beyond a summary of agency's services, no
vital documents are translated. OCP should
translate vital documents and upload them
on its website. Targeted outreach is needed to
ensure agency is accessible to all vendors.

## quality
### 2/3

No complaints were filed against the agency in
FY14, and the agency was not tested.

### FY14 Top Languages Encountered:
Spanish

With eight encounters reported in FY14, an increase from zero reported in FY13, it appears Office of Contracting and Procurement (OCP) has had slightly more contact with LEP/NEP-owned businesses and/or residents over the last year. To further increase the agency's limited exposure to the District's LEP/NEP business community, OHR strongly recommends OCP conduct targeted outreach to diverse immigrant-owned businesses, and ensure that this population is aware of OCP's role and services.

Additionally, ensuring that vital documents promoting key services offered by OCP – fsuch as its 'FAQ on Requirements for Doing Business with the District', or description and schedule of 'Vendor Workshops and Trainings' – would prove useful for LEP/NEP businesses who may currently be excluded from access to agency resources and thus opportunities to bid on contracts. In FY15, OHR urges OCP to prioritize such vital documents for translation in languages encountered, or likely to be encountered by the agency.

OHR recommends OCP accelerate efforts to be in full compliance with Language Access requirements by putting in place a reliable system for tracking interactions with LEP/NEP customers, and by training all front-line staff on Language Access requirements and resources.

# Office of Planning



**8/12**
overall compliance
score



District of Columbia
Office of Planning

 FY14 Encounters
16

 FY13 Score
11/12

### FY14 Top Languages Encountered:
### Chinese and Spanish

## preparedness
### 4/4

With a comprehensive data collection
mechanism in place and regular trainings for
frontline staff, OP is adequately prepared to
serve LEP/NEP customers.

## accessibility
### 2/5

A description of core services must be
available in top languages encountered by
the agency. Targeted outreach to LEP/NEP
stakeholders should be prioritized in FY15.

## quality
### 2/3

No complaints were filed against the agency in
FY14, and no field test were conducted.

OHR acknowledges the Office of Planning (OP) for continuing efforts in FY14 to comply with the Language Access Act and for working closely with the Language Access program to fulfill training, planning and reporting requirements. OHR also credits OP for capturing language information on sign-in sheets used at public meeting as an additional source of data.

While OP consistently reports minimal contact with LEP/NEP populations, including only 16 encounters in FY14, OHR maintains that applying more culturally and linguistically targeted strategies in public engagement efforts would yield more interaction with LEP/NEP stakeholders. In FY15, OHR advises OP to work with its Neighborhood Planning Division and ensure planners assigned to neighborhoods are aware of the linguistic and cultural diversity within those areas. In addition, the Mayor's ethnic constituency agencies, the DC Language Access Coalition's diverse immigrant-serving member organizations and ethnic media outlets are important partners to increase LEP/NEP participation in planning and engagement efforts.

In FY15, OHR recommends that OP proactively translate key vital documents – such as notices related to neighborhood engagement activities, workshop announcements, etc. - into languages that are likely to be encountered by the agency to aide outreach efforts and improve OP's overall accessibility to LEP/NEP communities.

# Office of Tax and Revenue





**5/12**
overall compliance score


**FY14 Encounters**
1456 (up to June '14)


**FY13 Score**
6/12

## FY14 Top Languages Encountered:

Spanish, Amharic, Mandarin, Vietnamese, Korean, Somali, Russian, Hebrew, Tamil, and Hindi

## preparedness
## 1/4

Instituting a comprehensive data collection mechanism and training public contact staff remain top preparedness priorities for OTR.

## accessibility
## 2/5

Agency needs to immediately translate its vital documents into languages that meet the threshold. As is, agency is not accessible to LEP/NEP customers.

## quality
## 2/3

While no formal complaints have been filed against the agency, OTR did not respond to public requests for translated documents.

OHR urges the Office of Tax and Revenue (OTR) to take swift action to put in place the requisite infrastructure needed to meet language access compliance requirements. Per OHR records, the agency is lagging behind on key compliance requirements for major public contact agencies, namely the adoption of a signed Language Access Policy and routine planning and reporting expectations that often go unfulfilled.

OTR interacted with 1456 LEP/NEP customers in FY14, but is not positioned to provide meaningful access to this population. As outlined in previous compliance assessments, taglines on agency-generated correspondence instructing LEP/NEP customers to contact OTR for assistance does not constitute meaningful access. OHR requests OTR accelerate efforts and translate non-federal vital documents into top languages encountered by the agency. OTR is advised to prioritize translation of key documents - its FAQ Sheets, FR500 Form, Clean Hands Certification Form, and a description of its core services – by making these translations available online.

OTR relies on two methods – tally of bilingual staff interactions and Language Line reports - to report data on LEP/NEP encounters. OHR urges the agency to ensure that other sources - such as reception area/event sign-in sheets and language preference drop-down menu in customer management tracking software – be utilized to ensure that the agency is collecting comprehensive data on its encounters with LEP/NEP customers.

# Office of the People's Counsel



**12/12**
overall compliance
score



 FY14 Encounters
4,579

 FY13 Score
12/12

## preparedness
### 4/4

With a reliable data collection mechanism in place and staff routinely trained on Language Access requirements and resources, the agency is fully prepared to serve LEP/NEP customers.

## accessibility
### 5/5

LEP/NEP customers are likely to enjoy full access to OPC's services as most, if not all, its vital documents are accessible in languages that reflect needs, and agency conducts culturally competent outreach.

## quality
### 3/3

OPC was not tested in FY14, and no complaints were filed against the agency in FY14.

### FY14Top Languages Encountered:

Spanish, Amharic, Chinese, French, Vietnamese, Arabic, Japanese, Portuguese, Yoruba, and Tigrinya

OHR commends Office of the People's Counsel (OPC) for exemplary efforts in FY14 to meet the compliance requirements of the Language Access Act and for taking proactive steps to facilitate meaningful access and inclusion for LEP/NEP residents. The agency worked closely with the Language Access Program throughout the year to fulfill planning, reporting, and training requirements.

OPC combines information from agency's customer tracking software, language line reports, and sign-in sheets to successfully report comprehensive and detailed data on LEP/NEP customers and languages encountered by the agency. OHR recognizes OPC for exceptional levels of compliance in data collection, as well as in outreach to LEP/NEP populations, which is reflected in agency's 4,579 encounters reported for FY14. OPC conducted and co-sponsored a total of 55 community-based events in FY14 targeting diverse LEP/NEP communities.

In FY15, OHR strongly encourages OPC to focus on expanding translation of vital documents to not only Spanish, but also other languages – such as Amharic and Chinese – encountered frequently by the agency.

# Office of the State Superintendent for Education



**8/12**
overall compliance score



## preparedness
## 2/4

Instituting a comprehensive agency-wide data collection mechanism and training public contact and grantee staff remain top preparedness priorities for OSSE.

## accessibility
## 4/5

Agency needs to take immediate steps to translate vital documents into languages that meet the legally mandated threshold and make them available on OSSE's website.

## quality
## 2/3

While no formal complaints have been filed against the agency in FY14, OSSE needs to do more to ensure quality access and services are provided to LEP/NEP residents

 **FY14 Encounters**
13,499

 **FY13 Score**
12/14

### FY14 Top Languages Encountered:
Spanish, Amharic, Mandarin, Vietnamese, Korean, Somali, Russian, Hebrew, Tamil, and Hindi

OHR credits the Office of the State Superintendent for Education (OSSE) for taking steps over the last two years to improve the agency's compliance. However, given OSSE's extensive contact with LEP/NEP populations, oversight of federal programs at local education agencies, and partnerships with grantees that provide critical services targeting LEP/NEP populations, it is vital it maintains an agency-wide commitment to tackle ongoing compliance gaps and serve the needs of LEP/NEP communities.

While OSSE has shown improvements in data collection, it has yet to implement plans since FY12 to: a) update statewide data tracking system to capture students' language needs; b) introduce a drop-down field to the Parent Call Center database to include language line use; c) provide bilingual staff with a form to track encounters; and d) recruit Divisional Language Access Liaisons to support efforts within individual divisions as members of the Language Access Team.

OHR also recommends priorizing the following in FY15: a) adding a 'language support' feature on agency's website by uploading translations of agency's core services; b) uploading all existing translated documents on language support pages; c) providing OHR with a list of documents to be translated in FY15-16; and d) training all public contact staff, grantees and service providers on their legal obligation to provide language assistance.

# Office of the Tenant Advocate



**8/12**
overall compliance
score



 FY14 Encounters
114

 FY13 Score
8/12

## preparedness

### 3/4

Agency-wide training on Language Access
compliance requirements and a streamlined
data collection system are needed to ensure
that OTA staff are fully prepared to serve LEP/
NEP customers.

## accessibility

### 3/5

LEP/NEP customers would experience difficulty
accessing services and information because
translated documents do not reflect the
language needs of the community, nor are they
centrally available on OTA's website.

## quality

### 2/3

No complaints were filed against the agency in
FY14, and no field tests were conducted.

### FY14 Top Languages Encountered:

Spanish, Amharic, Vietnamese, Chinese, French, and Korean

OHR acknowledges the Office of Tenant Advocate (OTA) for its outreach efforts in FY14 and credits the agency's proactive steps to partner with local organizations and ethnic media outlets to increase participation of diverse LEP/NEP residents in its programs and services. While the agency participated in a total of seven outreach events targeting LEP/NEP tenants and landlords in FY14, OHR must underscore the total of 114 LEP/NEP encounters reported for FY14 as an indication that more work needs to be done to improve agency's overall accessibility to linguistically diverse residents.

OHR urges OTA to take immediate steps to translate vital documents and ensure that at a minimum, prioritized documents such as the Tenant Bill of Rights or the FAQ on Tenant Rights are available in top languages encountered by the agency. OHR suggests OTA also review documents already translated in order to make sure they still reflect the needs of LEP/NEP clients, and upload all translated documents on the agency website for greater accessibility.

In FY15, OTA needs to ensure that both the agency's public contact staff and grantees who receive funding from the agency are trained on their Language Access compliance requirements and are prepared to provide quality service to LEP/NEP customers.

# Office of Unified Communications





## 12/12
### overall compliance score

 **FY14 Encounters**
10,135

 **FY13 Score**
12/12

### FY14 Top Languages Encountered:

Spanish, Amharic, Chinese, French, Vietnamese, Korean, Arabic, Japanese, Portuguese, and Tigrinya

## preparedness
### 4/4

With a comprehensive data collection mechanism and sufficient staff training, the agency is adequately prepared to assist LEP/NEP customers.

## accessibility
### 5/5

Language Line usage reports demonstrate agency routinely provides interpretation services to LEP/NEP callers. Agency's translated documents are centralized under 'language support' page for each language.

## quality
### 3/3

No complaints were filed against the agency in FY14, and no field tests were conducted. Steady progress in customer service observed at the agency.

OHR applauds the Office of Unified Communications (OUC) for effective and exceptional efforts in FY14 to fully meet all requirements of the Language Access Act. In FY14, OUC took proactive steps to facilitate meaningful access and inclusion of LEP/NEP residents, and worked closely with the Language Access Program to fulfill training, planning and reporting requirements.

OUC reported 10,135 LEP/NEP encounters in FY14. OHR credits the agency for successfully implementing a comprehensive data collection strategy that fully captures the agency's extensive contact with LEP/NEP customers through its customer service hotlines and outreach activities. In an effort to ensure reliability and accuracy of this data, OHR recommends that OUC take additional steps to clearly identify the source of each set of data when reporting encounters to OHR.

In light of OUC's extensive contact with LEP/NEP populations, OHR encourages the agency to continue ensuring all public contact staff are routinely trained on Language Access requirements and are equipped to provide quality service to all LEP/NEP customers. In addition to training, OHR further recommends OUC take steps in FY15 to translate outreach material into additional languages and enhance its cultural and linguistic competency by attracting bilingual staff who reflect the populations the agency serves.

# Office of Zoning



## 12/12
### overall compliance score



 FY14 Encounters
9

 FY13 Score
12/12

## preparedness
### 4/4

Agency has a comprehensive mechanism in place for tracking data on LEP/NEP encounters. OZ is well prepared to serve LEP/ NEP customers, and should continue ensuring agency-wide training on Language Access requirements.

## accessibility
### 5/5

OZ has comprehensive signage in place to facilitate access for customers who need language assistance. Translated documents are centralized and easily accessible on agency's website.

## quality
### 3/3

No complaints were filed against the agency in FY14, and no field tests were conducted.

### FY14Top Languages Encountered:
### Spanish and Korean

OHR congratulates the Office of Zoning (OZ) on fully meeting the requirements of the Language Access Act for a third year in a row. In FY14, OZ worked closely with the Language Access Program to successfully fulfill accessibility, training, planning and reporting requirements.

OZ reports minimal encounters with LEP/NEP customers – nine in FY14 and seven in FY13. To increase the agency's limited interactions with LEP/ NEP communities, OHR recommends OZ translate its introductory 'Zoning 101' training into languages likely to be encountered, and partner with the Mayor's ethnic constituency office, and members of the DC Language Access Coalition to conduct targeted outreach to linguistically diverse neighborhoods. This will ensure that LEP/NEP residents are informed about and can access the agency's zoning services.

OHR credits OZ for translating seven documents into Spanish in FY14, and for centralizing all translated documents - including agency's brochure, a glossary of terms, and forms – under the 'language support' page for six different languages.  OHR encourages OZ to pursue plans to translate 'Zoning 101' and other tutorials into additional languages, and ensure that documents that are currently available in Spanish are also available in other languages the agency is likely to encounter.

## By the Numbers:
### Implementation of Act Requirements

**152,732** LEP/NEP encounters reported by major public contact agencies

**71,139** agency calls to provide telephonic interpretation

**1,638** vital documents translated by agencies

## Top 10 languages based on Language Line usage

| 59,057 | 5,627 | 1,900 | 1,019 | 844 | 474 | 450 | 312 | 222 | 196 |
|--------|-------|-------|-------|-----|-----|-----|-----|-----|-----|
| Spanish | Amharic | Chinese | French | Vietnamese | Arabic | Cantonese | Tigrinya | Korean | Bengali |

## Top 10 languages based on agency reported encounters

| 101,602 | 14,091 | 9,103 | 4,954 | 2,524 | 2,347 | 1,486 | 1,457 | 1,145 | 492 |
|---------|--------|-------|-------|-------|-------|-------|-------|-------|-----|
| Spanish | Amharic | Chinese | French | Vietnamese | Russian | Italian | Korean | Portuguese | Arabic |

# 3,017

agency staff, grantees and contractors trained on language access

### seven-hundred and fifty

bilingual employees were reported to be working at the 33 agencies with major public contact



**Percent of Training by Type**

1. OHR-led (51%)
2. In-house (25%)
3. Public service organization (12%)
4. Online (3%)
5. Center for Learning & Development (5%)

**Top five languages of bilingual staff:**
Spanish (598); Amharic (54); French (41); Chinese (20); and Vietnamese (15).

# Compliance Details

Agency scores are based on questions related to compliance with the Language Access Act. An 'x' indicates successful completion of the requirement. An 'n/a' indicates the particular question does not apply to the specific agency for FY14.

| AGENCY NAME | ABRA | CFSA | DCHA | DCLB | DCPL | DCPS | DBH | DCRA | DDS | DOES | DOH | DHCD | DOHR | OHS | DMV | DPR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PREPAREDNESS** | | | | | | | | | | | | | | | | |
| P1. Agency provided data on FY14 encounters | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| P2. Method for collecting data was comprehensive. | | X | X | | X | X | X | X | X | X | X | X | X | X | X | X |
| P3. Agency staff trained in FY14. | X | X | | | X | | | | X | | | X | X | X | X | |
| P4. Agency communicated effectively. | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X |
| PREPAREDNESS SCORE | 3 | 4 | 3 | 1 | 4 | 3 | 3 | 3 | 4 | 3 | 3 | 3 | 4 | 4 | 4 | 3 |
| **ACCESSIBILITY** | | | | | | | | | | | | | | | | |
| A5. Requests for interpretation and/or translation services were met. | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| A6. Vital documents were translated and/or updated in FY14. | | X | X | | X | X | X | X | | X | X | | X | | X | X |
| A7. Vital documents translated in FY14 reflect the needs of LEP/NEP | | X | X | | X | X | X | X | | | | | X | X | X | X |
| A8. Efforts were made to reachout to LEP/NEP communities in FY14. | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| A9. Translated vital documents accessible on agency website. | | X | X | | X | | | | X | | | | X | | X | |
| ACCESSIBILITY SCORE | 2 | 5 | 5 | 2 | 5 | 4 | 4 | 4 | 3 | 3 | 3 | 2 | 5 | 3 | 5 | 4 |
| **QUALITY** | | | | | | | | | | | | | | | | |
| Q10. No recurring problems or a trend observed in the nature of complaints. | X | X | | X | X | X | X | X | X | X | X | X | | | | X |
| Q11. Agency was not found in non-compliance in FY14. | X | X | X | X | X | X | X | X | X | X | X | X | | | | X |
| Q12. No tester was turned away during tests. | n/a | n/a | | n/a | n/a | | n/a | | n/a | | | X | n/a | | | n/a |
| Q13. All testers who accessed employee or interpretation received requested information or services. | n/a | n/a | X | n/a | | X | n/a | X | n/a | | | | n/a | | | n/a |
| Q14. OHR has observed significant improvement in LA implementation in FY14. | X | X | | | X | | X | | | | | | X | | X | X |
| QUALITY SCORE | 3 | 3 | 2 | 2 | 3 | 3 | 3 | 3 | 2 | 3 | 2 | 3 | 3 | 0 | 1 | 3 |
| **TOTAL AGENCY SCORE** | | | | | | | | | | | | | | | | |
| TOTAL POSSIBLE SCORE | 12 | 12 | 14 | 12 | 12 | 14 | 12 | 14 | 12 | 14 | 14 | 14 | 12 | 14 | 14 | 12 |

| AGENCY NAME | DPW | DSLBD | DDOE | DDOT | FEMS | HSEMA | MPD | OA | OCP | OP | OTR | OPC | OSSE | OTA | DUC | DZ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PREPAREDNESS** | | | | | | | | | | | | | | | | |
| P1. Agency provided data on FY14 encounters. | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| P2. Method for collecting data was comprehensive. | x |  | x | x |  |  | x |  | x | x |  | x |  | x | x | x |
| P3. Agency staff trained in FY14. |  |  | X | X |  | X | X | X |  | X |  | X |  |  | X | X |
| P4. Agency communicated effectively. | X | X | X | X | X | X | X | X | X | X |  | X | X | X | X | X |
| PREPAREDNESS SCORE | 3 | 2 | 4 | 4 | 2 | 3 | 4 | 3 | 3 | 4 | 1 | 4 | 2 | 3 | 4 | 4 |
| **ACCESSIBILITY** | | | | | | | | | | | | | | | | |
| A5. Requests for interpretation and/or translation services were met. | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| A6. Vital documents were translated and/or updated in FY14. | X | X | X | X |  | X | X | X | X |  |  | X | X | X | X | X |
| A7. Vital documents translated in FY14 reflect the needs of LEP/NEP. | X |  | X | X |  | X | X | X |  |  |  | X | X |  | X | X |
| A8. Efforts were made to reachout to LEP/NEP communities in FY14. | X | X | X | X |  | X | X | X | X | X | X | X | X | X | X | X |
| A9. Translated vital documents accessible on agency website. | X |  |  |  |  | X | X |  |  |  |  | X |  |  | X | X |
| ACCESSIBILITY SCORE | 5 | 3 | 4 | 4 | 1 | 5 | 5 | 4 | 3 | 2 | 2 | 5 | 4 | 3 | 5 | 5 |
| **QUALITY** | | | | | | | | | | | | | | | | |
| Q10. No recurring problems or a trend observed in the nature of complaints. | X | X | X | X |  | X | X | X | X | X | X | X | X | X | X | X |
| Q11. Agency was not found in non-compliance in FY14. | X | X | X | X |  | X |  | X | X | X | X |  | X | X |  | X |
| Q12. No tester was turned away during tests. | n/a |  | n/a | n/a | x | x | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Q13. All testers who accessed employee or interpretation received requested information or services. | n/a |  | n/a | n/a |  |  | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Q14. OHR has observed significant improvement in LA implementation in FY14. |  | x | x | x |  | x | x | x |  |  |  | x | x |  | x | x |
| QUALITY SCORE | 2 | 3 | 3 | 3 | 1 | 4 | 2 | 3 | 2 | 2 | 2 | 2 | 3 | 2 | 2 | 3 |
| **TOTAL AGENCY SCORE** | 10 | 8 | 11 | 11 | 4 | 12 | 11 | 10 | 8 | 8 | 5 | 11 | 9 | 8 | 11 | 12 |
| TOTAL POSSIBLE SCORE | 12 | 14 | 12 | 12 | 14 | 14 | 14 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |

**DISTRICT OF COLUMBIA
OFFICE OF HUMAN RIGHTS**

Language Access Program Fiscal Year 2014

ohr.dc.gov
Phone: (202) 727-4559
Fax: (202) 727-9589

441 4th Street, NW, Suite 570N
Washington, DC 20001

08/12/15

560

TAYLOR STREET SERVICE CENTER
1207 TAYLOR STREET, NW
WASHINGTON    DC  20011

PHONE NUMBER : 2025763000

NEGACION

ESTIMADO SR/SRA NOLASCO-SANTOS

SU SOLICITUD CON FECHA 07/13/2015 PARA THE ALLIANCE PROGRAM HA SIDO
RECHAZADA DEBIDO A YOUR CURRENT INCOME EXCEEDS POLICY STANDARDS

CASE NO. 00485548
CASELOAD ID. 2B1E02